WILLIAM H. GIFFORD ET AL. *v.* FREEDOM OF
INFORMATION COMMISSION ET AL.
(14682)
(14683)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued June 4—decision released September 7, 1993

*Ralph G. Elliot,* with whom were *Mitchell W. Pearlman,* general counsel, *Victor R. Perpetua,* commission counsel, *Barry D. Guliano* and, on the brief, *James H. Howard,* for the appellants (defendants).

*Mary H. Lesser,* assistant state's attorney, for the appellee (plaintiff John M. Bailey).

*Eileen McGann* and *Mark Kravitz* filed a brief for the Connecticut Daily Newspaper Association et al. as amici curiae.

BORDEN, J. The issue in these appeals is whether a municipal police department arrest report must be disclosed by the police department to the public, pursuant to the Freedom of Information Act (act); General Statutes §§ 1-7 through 1- 21k; while the criminal prosecution that is related to the arrest report is pending. The defendants, the freedom of information commission (commission) and the Journal Inquirer newspaper and its news editor, Robert H. Boone, appeal[1] from the judgment of the trial court. That judgment sustained the appeal of the plaintiffs, William H. Gifford and John M. Bailey,[2] from the decision of the commission. The trial court concluded that the commission had improperly determined that such an arrest report must be disclosed to the public during the pendency of the criminal prosecution. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history. On September 12, 1989, a police officer from the Windsor Locks police department was dispatched to a restaurant in that town to investigate a report of a disturbance between the owner of the establishment and two young males. The owner of the restaurant

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[2] John M. Bailey, the chief state's attorney, was substituted as a party for Richard N. Palmer, the former chief state's attorney, who, in turn, had been substituted for John J. Kelly, Palmer's predecessor in that position. We previously had concluded that the chief state's attorney was aggrieved by the decision of the commission and accordingly we ordered the trial court to grant his motion to be a party to these proceedings. See *Kelly* v. *Freedom of Information Commission,* 221 Conn. 300, 603 A.2d 1131 (1992).

informed the officer that two young males, one of whom was known to him, had threatened him with a knife and had given him anti-Semitic and racist literature.

Shortly thereafter, the two males described by the owner were found nearby and transported to the police station for questioning. A witness[3] to the incident also went to the police station and confirmed the store owner's account of the events. The witness also stated that one of the males, William Landers,[4] had accused the store owner of selling drugs and had warned the owner that he "better watch this drug business." Both individuals were subsequently arrested on various charges. While being held for arraignment, Landers attempted to commit suicide. The investigating officer drafted an arrest report, dated September 12, 1989, that records these events.

The following day, a reporter from the Journal Inquirer requested a copy of the arrest report that had been prepared in connection with these arrests. William Gifford, the chief of police of the town of Windsor Locks, on advice from the state's attorney's office, denied the reporter's request for a copy of the report during the pendency of the criminal prosecution. Following the completion of the criminal prosecution that resulted from the arrest report, however, Gifford released a copy of the report to the Journal Inquirer.

The Journal Inquirer and Boone lodged a complaint with the commission claiming that Gifford's refusal to release the arrest report during the pendency of the criminal case violated General Statutes § 1-19 (a).[5] In

[3] The witness' name has been redacted from the copy of the arrest report that was introduced as an exhibit at the administrative hearing in this case.

[4] The other individual who was arrested following the incident at the establishment was a juvenile at that time. Consequently, pursuant to General Statutes § 46b-124, his identity has not been disclosed.

[5] General Statutes § 1-19 provides in relevant part: "ACCESS TO PUBLIC RECORDS. EXEMPT RECORDS. (a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any pub-

response, the plaintiffs claimed that arrest reports are exempt from disclosure under General Statutes §§ 1-19 (b) (3) (B), 1-19b (b), 1-20b, 1-19 (b) (4), 1-19c and article twenty-third of the amendments to the Connecticut constitution.[6] Specifically, the plaintiffs con-

lic agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to inspect such records promptly during regular office or business hours or to receive a copy of such records in accordance with the provisions of section 1-15. Any agency rule or regulation, or part thereof, that conflicts with the provisions of this subsection or diminishes or curtails in any way the rights granted by this subsection shall be void. Each such agency shall keep and maintain all public records in its custody at its regular office or place of business in an accessible place and, if there is no such office or place of business, the public records pertaining to such agency shall be kept in the office of the clerk of the political subdivision in which such public agency is located or of the secretary of the state, as the case may be. . . ."

[6] General Statutes § 1-19 (b) provides in pertinent part: "Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be construed to require disclosure of . . . (3) records of law enforcement agencies not otherwise available to the public which records were compiled in connection with the detection or investigation of crime, if the disclosure of said records would not be in the public interest because it would result in the disclosure of (A) the identity of informants not otherwise known, (B) information to be used in a prospective law enforcement action if prejudicial to such action . . . (4) records pertaining to strategy and negotiations with respect to pending claims or pending litigation to which the public agency is a party until such litigation or claim has been finally adjudicated or otherwise settled . . . ."

General Statutes § 1-19b provides: "AGENCY ADMINISTRATION. DISCLOSURE OF PERSONNEL, BIRTH AND TAX RECORDS. JUDICIAL RECORDS AND PROCEEDINGS. (a) Sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be: (1) Construed as requiring each public agency to open its records concerning the administration of such agency to public inspection; and (2) construed as requiring each public agency to disclose information in its personnel files, birth records or confidential tax records to the individual who is the subject of such information.

"(b) Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be deemed in any manner to (1) affect the status of judicial records as they existed prior to October 1, 1975, nor to affect the rights of litigants, including parties to administrative proceedings, under the laws of discovery of this state or (2) require disclosure of any record of a personnel search committee which, because of name or other identify-

tended that disclosure was not required by statute, and that nondisclosure was necessary: (1) to protect witnesses; (2) to protect juveniles; (3) to facilitate additional police investigations if requested by the state's attorney's office; (4) to minimize unfavorable pretrial publicity that would necessitate a change of venue; (5) to preclude any prejudice caused by publication of a defendant's confession or admission; (6) to avoid publication of inadmissible evidence; and (7) to avoid conflict with the rules of discovery set forth in General Statutes § 54-86b and Practice Book §§ 746, 752 and 753.[7]

ing information, would reveal the identity of an executive level employment candidate without the consent of such candidate."

General Statutes § 1-20b provides: "RECORD OF AN ARREST AS PUBLIC RECORD. Notwithstanding any provision of the general statutes to the contrary, any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19. For the purposes of this section, 'record of the arrest' means the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested."

General Statutes § 1-19c provides: "DIVISION OF CRIMINAL JUSTICE DEEMED NOT TO BE PUBLIC AGENCY, WHEN. For the purposes of subsection (a) of section 1-18a, the division of criminal justice shall not be deemed to be a public agency except in respect to its administrative functions."

Article twenty-third of the amendments to the Connecticut constitution provides in pertinent part: "There shall be established within the executive department a division of criminal justice which shall be in charge of the investigation and prosecution of all criminal matters. Said division shall include the chief state's attorney, who shall be its administrative head, and the state's attorneys for each judicial district, which districts shall be established by law. The prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each district. The chief state's attorney shall be appointed as prescribed by law. . . ."

[7] General Statutes § 54-86b provides: "RIGHT OF ACCUSED TO EXAMINE STATEMENTS. (a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court

Several witnesses testified at the administrative hearings on the complaint. First, Gifford testified that he had a long-standing policy of refusing to release arrest reports until the prosecution related to such a report was no longer pending. He testified that this policy was necessary to protect the identity of witnesses to the

shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

Practice Book § 746 provides: "INFORMATION NOT SUBJECT TO DISCLOSURE

Except for the substance of any exculpatory material contained herein, Sec. 740 does not authorize or require disclosure or inspection of:

"(1) Reports, memoranda or other internal documents made by a prosecuting authority or by law enforcement officers in connection with the investigation or prosecution of the case;

"(2) Statements made to prosecuting authorities or law enforcement officers except as provided in Sec. 748;

"(3) Legal research;

"(4) Records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of a prosecuting authority."

Practice Book § 752 provides: "PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

Practice Book § 753 provides: "DELIVERY AND EXCISION OF STATEMENTS

"If the entire contents of a statement requested under Sec. 752 relate to the subject matter of the testimony of the witness, the judicial authority shall order the statement to be delivered directly to the defendant or his counsel for his examination and use. If the prosecuting authority claims that any statement ordered to be produced under Sec. 751 contains matter which does not relate to the subject matter of the testimony of the witness, the judicial authority shall order the prosecuting authority to deliver such statement for the inspection of the judicial authority in camera. Upon such delivery, the judicial authority shall not disclose that portion of such statement which does not relate to the subject matter of the testimony of the witness. With such material excised or obliterated, the judicial authority shall then direct delivery of such statement to the defendant or his counsel for his use. If, pursuant to this procedure, any portion of such statement is withheld from the defendant or his counsel and the defendant objects

events culminating in the arrest, including the names of any police officers who were likely to be called to testify at trial.

Then chief state's attorney John J. Kelly testified that the standard practice if an arrest is made is for the police department to prepare an arrest report that details the investigation that led to the arrest, and then to forward a copy of the document to the appropriate state's attorney's office. This document then serves as the basis upon which the prosecutor may make future decisions regarding the case, and, in particular, determine whether further investigation by the police is necessary. Kelly also explained that a typical arrest report contains the summary of events that resulted in the arrest, the names and addresses of witnesses and victims of the crime, information given by such witnesses, and any further police action corroborating the allegations of witnesses. In addition, Kelly testified that if police departments were obligated to disclose such reports during the pendency of a criminal case, witnesses could be located and intimidated, the identity of victims of sexual assault or of youthful offenders might become public, and the defendant's right to a fair trial could be damaged by any resulting publicity.

Assistant state's attorney T.R. Paulding, who at that time was the supervising prosecutor for geographical area thirteen of the Hartford-New Britain judicial district, testified that a criminal case begins at the time of the arrest, and can be concluded only through a judicial resolution. He testified that the police report in this case had been used throughout the case for various pur-

to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be sealed and preserved as an exhibit in the case, and, in the event that the defendant appeals, it shall be made available to the appellate court and, unless for good cause the trial court orders otherwise, to counsel for the parties for the purpose of determining the correctness of the ruling of the judicial authority."

poses, including assessing the validity of the charges, determining the strategy to be employed in the case and establishing in court that there was probable cause to arrest the defendant. Paulding also testified that the release of the arrest report in this case, while the prosecution was pending, could have jeopardized the defendants' fair trial rights and could have resulted in witness or victim intimidation.

The commission concluded in its final decision on September 12, 1990, that, during the pendency of a criminal prosecution, an arrest report must be disclosed upon request to the public pursuant to General Statutes §§ 1-15[8] and 1-19 (a) of the act. The commission stated

---

[8] General Statutes § 1-15 provides: "APPLICATION FOR COPIES OF PUBLIC RECORDS. CERTIFIED COPIES. FEES. (a) Any person applying in writing shall receive, promptly upon request, a plain or certified copy of any public record. The fee for any copy provided in accordance with this section and sections 1-18a, 1-19 and 1-19b, and sections 1-21 to 1-21k, inclusive, shall not exceed fifty cents per page. If any copy provided in accordance with said sections requires a transcription, or if any person applies for a transcription of a public record, the fee for such transcription shall not exceed the cost thereof to the public agency.

"(b) The fee for any copy provided in accordance with subsection (a) of section 1-19a shall not exceed the cost thereof to the public agency. In determining such costs for a copy other than a printout, an agency may include only: (1) An amount equal to the hourly salary attributed to all agency employees engaged in providing the requested computer-stored public record, including their time performing the formatting or programming functions necessary to provide the copy as requested, but not including search or retrieval costs except as provided in subdivision (4) of this subsection; (2) an amount equal to the cost to the agency of engaging an outside professional electronic copying service to provide such copying services, if such service is necessary to provide the copying as requested; (3) the actual cost of the storage devices or media provided to the person making the request in complying with such request; and (4) the computer time charges incurred by the agency in providing the requested computer-stored public record where another agency or contractor provides the agency with computer storage and retrieval services. Notwithstanding any other provision of this section, the fee for any copy of the names of registered voters shall not exceed three cents per name delivered or the cost thereof to the public agency, as determined pursuant to this subsection, whichever is less. The office of information and technology shall monitor the calculation of the

that, except for the names and addresses of witnesses, such arrest reports were not exempt from disclosure and ordered Gifford to "comply with the disclosure requirements of § 1-19 (a)." The commission also "caution[ed] [Gifford] to take care to comply with the law in the future or [he] may risk further consequences for [his] continuing disregard of the law."[9]

fees charged for copies of computer-stored public records to ensure that such fees are reasonable and consistent among agencies. Notwithstanding any provision of this chapter to the contrary, (A) any person who requests computer-stored public records from an agency and is aggrieved by the agency's decision on the fee for such records may appeal to the secretary of the office of policy and management or his designee, (B) the secretary or such designee shall conduct a hearing on any such appeal in accordance with the provisions of sections 4-176e to 4-184, inclusive, and (C) any party aggrieved by the decision of the secretary or such designee may appeal therefrom, in accordance with the provisions of section 4-183.

"(c) A public agency may require the prepayment of any fee required or permitted under this chapter if such fee is estimated to be ten dollars or more. The sales tax provided in chapter 219 shall not be imposed upon any transaction for which a fee is required or permissible under this section or section 1-21c.

"(d) The public agency shall waive any fee provided for in this section when (1) the person requesting the records is an indigent individual, (2) the records located are determined by the public agency to be exempt from disclosure under subsection (b) of section 1-19, or (3) in its judgment, compliance with the applicant's request benefits the general welfare.

"(e) Except as otherwise provided by law, the fee for any person who has the custody of any public records or files for certifying any copy of such records or files, or certifying to any fact appearing therefrom, shall be for the first page of such certificate, or copy and certificate, one dollar; and for each additional page, fifty cents. For the purpose of computing such fee, such copy and certificate shall be deemed to be one continuous instrument."

[9] At the time the commission released its final decision, the arrest report at issue in this case had been released to the public. Consequently, the specific relief sought by the defendants, namely, disclosure of the report, already had been granted. After seeking supplemental briefing on the issue of mootness, the trial court concluded that the issue was not moot. We agree. The order issued by the commission is prospective in nature and impacts the discovery obligations of the state's attorneys in pending criminal matters. *Kelly* v. *Freedom of Information Commission*, 221 Conn. 300, 313, 603 A.2d 1131 (1992). Consequently, we conclude that this appeal is not moot.

The plaintiffs filed separate appeals in the trial court claiming that the commission had improperly concluded that the act required disclosure of an arrest report while the criminal prosecution is pending. The trial court sustained the plaintiffs' appeals concluding that: (1) pursuant to § 1-19c, the division of criminal justice (division) is not a public agency while engaged in the investigation and prosecution of a criminal case; (2) the jurisdiction of the division attaches at the time of arrest; (3) the arrest report, although compiled by police, is, upon its completion, a record of the division; (4) disclosure of an arrest report during the pendency of a criminal prosecution, without permission of the division, constitutes a violation of § 1-19b (b) and the specific statutory and Practice Book rules of discovery; (5) the premature release of an arrest report violates the rights of the division as a party to negotiations pursuant to § 1-19 (b) (4); (6) § 1-20b limits the disclosure obligation regarding arrest reports to the "name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested"; and (7) law enforcement records as contemplated in § 1-19 (b) (3) (A) and (B) pertain to ongoing investigations and contemplated or prospective law enforcement proceedings such as an arrest to be made at a later date, and do not include already compiled arrest reports. *Gifford* v. *Freedom of Information Commission,* 42 Conn. Sup. 291, 300–301, 617 A.2d 479 (1992).[10] These appeals followed.[11]

[10] Because we agree with the trial court that General Statutes § 1-20b limits the scope of disclosure required under the facts of this case, we need not address the propriety of the trial court's reliance on other grounds. Despite the dissent's urging to the contrary, we leave those questions to a case in which it is necessary to decide them.

[11] The defendants filed separate appeals in the Appellate Court. Before the appeals were transferred to this court, however, the Appellate Court ordered the defendants to file a consolidated brief.

The commission claims that the trial court improperly concluded that the act does not require disclosure of arrest reports while the criminal prosecution is pending. We disagree.[12]

At the outset, it is useful to note several principles that guide our resolution of the issue raised by these appeals. First, the facts of this case limit our discussion of the commission's claim solely to the issue of whether arrest reports must be disclosed during the pendency of the criminal prosecution. The facts of this case do not raise, nor do we need to decide, whether a police report of any kind must be released before an arrest is made, or whether an arrest report must be released after the criminal case to which the report relates has been fully adjudicated.

Second, we recognize, as a general matter, that "there is an 'overarching policy' underlying the [act] favoring the disclosure of public records. *Chairman* v. *Freedom of Information Commission,* 217 Conn. 193, 196, 585 A.2d 96 (1991); *Hartford* v. *Freedom of Information Commission,* 201 Conn. 421, 431, 518 A.2d 49 (1986); *Maher* v. *Freedom of Information Commission,* 192 Conn. 310, 315, 472 A.2d 321 (1984). Our construction of the [act] must be guided by the policy favoring disclosure and exceptions to disclosure must be narrowly construed. *Ottochian* v. *Freedom of Information Commission,* 221 Conn. 393, 398, 604 A.2d 351 (1992); *Rose* v. *Freedom of Information Commission,* 221 Conn.

---

[12] The defendants Boone and the Journal Inquirer claim in this court that nondisclosure of arrest reports violates their common law and constitutional right of access to the courts and to court documents. The defendants did not raise these claims to the commission or in the trial court, nor did the trial court consider these principles in sustaining the plaintiffs' appeals. Consequently, as to the common law claim, we refuse to address it. As to the constitutional claim, Boone and the Journal Inquirer have not sought to prevail on the claim pursuant to *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or plain error review. We therefore decline to address it. See *State* v. *Cooper,* 227 Conn. 417, 428 n.7, 630 A.2d 1043 (1993).

217, 233, 602 A.2d 1019 (1992); *Lieberman* v. *State Board of Labor Relations,* 216 Conn. 253, 266, 579 A.2d 505 (1990); *Board of Police Commissioners* v. *Freedom of Information Commission,* 192 Conn. 183, 188, 470 A.2d 1209 (1984)." *Superintendent of Police* v. *Freedom of Information Commission,* 222 Conn. 621, 626, 609 A.2d 998 (1992).

This rule of construction, however, is not determinative. Indeed, although the act was intended as a general matter to promote openness in government; see, e.g., *Ottochian* v. *Freedom of Information Commission,* supra, 398; the act itself recognizes competing interests, and the need for some governmental records to remain confidential, at least initially. See, e.g., *Chairman* v. *Freedom of Information Commission,* supra, 199.

Third, although the act's general policy favoring public access to public records has strong constitutional underpinnings, the fact that the act implicates first amendment concerns of access to information does not control the interpretation of the act itself. Id., 198–99. Thus, the question of whether the legislature intended to compel disclosure of arrest reports during the pendency of a criminal prosecution presents an issue of statutory interpretation and, therefore, is a question of law. *Connecticut Humane Society* v. *Freedom of Information Commission,* 218 Conn. 757, 761, 591 A.2d 395 (1991). The objective of statutory construction is to give effect to the intended purpose of the legislature. *State* v. *Delafose,* 185 Conn. 517, 521, 441 A.2d 158 (1981). Moreover, "[i]t is a well-settled principle of construction that specific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling. *Charlton Press, Inc.* v. *Sullivan,* 153 Conn. 103, 110, 214 A.2d 354 [1965]. [If] there are two provisions in a statute, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one case or subject within the scope

of a general provision, then the particular provision must prevail; and if both cannot apply, the particular provision will be treated as an exception to the general provision. *Kelly* v. *Dewey,* 111 Conn. 281, 292, 149 A. 840 [1930]. *Budkofsky* v. *Commissioner of Motor Vehicles,* 177 Conn. 588, 592, 419 A.2d 333 (1979)." (Internal quotation marks omitted.) *Gaynor* v. *Union Trust Co.,* 216 Conn. 458, 476–77, 582 A.2d 190 (1990); *Galvin* v. *Freedom of Information Commission,* 201 Conn. 448, 456, 518 A.2d 64 (1986).

With these principles in mind, we turn to the act in order to determine whether the legislature intended that criminal arrest reports must be disclosed while the criminal prosecution related to the report is pending. We conclude that § 1-20b governs such disclosure, and does not mandate disclosure of an arrest report in these circumstances.

We begin our analysis by assuming, without deciding, that *but for* the language "[e]xcept as otherwise provided by any . . . state statute" in § 1-19 (a), an arrest report is a record "maintained or kept on file by any public agency" pursuant to that section.[13] We also assume, without deciding, that, *but for* the language "[e]xcept as otherwise provided by any . . . state statute" in § 1-19 (a) and *but for* § 1-20b, the plaintiffs have not demonstrated that this arrest report falls within any of the exemptions listed in § 1-19 (b). Nevertheless, we conclude that: (1) § 1-20b governs; (2) it provides for both a requirement of disclosure and a limit on the extent of that disclosure; and (3) it does not require the full disclosure of arrest reports during the pendency of a criminal prosecution.

We note, first, that § 1-20b is itself part of the Freedom of Information Act. Although § 1-20b was enacted six years after most of the act became law in 1977, that

---

[13] Consequently, we also assume, without deciding, that a municipal arrest report is not a record of the division pursuant to General Statutes §§ 1-18a and 1-19.

section is found in title 1, chapter 3 of our General Statutes. See, e.g., *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 686–88, 595 A.2d 313 (1991); *Healy* v. *Freedom of Information Commission*, 18 Conn. App. 212, 213, 557 A.2d 561 (1989). Consequently, this provision is part of the statutory scheme that regulates the circumstances under which a public agency must make its records available to the public for inspection or copying.

We turn now to the specific language of § 1-20b. That section states: *"Notwithstanding any provision of the general statutes to the contrary,* any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19. For the purposes of this section, 'record of the arrest' means the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested." (Emphasis added.) The language emphasized above indicates that a document falling within this section that would otherwise be governed by other portions of the act, or by any other provision of the General Statutes, is nonetheless governed, not by those other provisions,[14] but by this provision.[15]

---

[14] The dissent contends that our reliance on General Statutes § 1-20b renders General Statutes § 1-19 (b) (3) superfluous, and that § 1-19 (b) (3) controls the disclosure of arrest reports. We disagree. We recognize that the language of § 1-19 (b) (3); see footnote 6; could be interpreted to include arrest reports. This language, however, does not explicitly include a reference to arrest reports, and could be interpreted to cover other documents besides arrest reports that are maintained by a law enforcement agency and are not otherwise available to the public. Although there is no need to hypothesize what other documents may be covered by § 1-19 (b) (3), we conclude that the *explicit reference* to arrest reports in § 1-20b removes such documents from the coverage of § 1-19 (b) (3), and provides both the disclosure obligations for such reports and the appropriate limitations on

The first sentence of § 1-20b, by itself, establishes a broad disclosure requirement: *"[A]ny* record of the arrest of *any* person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed . . . ."* (Emphasis added.) The plain language of this sentence, therefore, must be read to include an arrest report. Certainly, an arrest report constitutes "any record of the arrest of any person." To hold otherwise would be to ignore the term "any" as it modifies the terms "record" and "person."

Our interpretation of "any record" to include an arrest report is buttressed by the inclusion of the language "except a record erased pursuant to chapter 961a . . . ." General Statutes § 54-142a,[16] which is

that disclosure. As a result, our interpretation does not render § 1-19 (b) (3) superfluous because, absent some other statutory provision shielding law enforcement documents from disclosure, that provision continues to regulate the disclosure of law enforcement documents other than arrest reports during the pendency of a criminal case.

[15] It is useful in this regard to compare the "notwithstanding" language of General Statutes § 1-20b to the "notwithstanding" language contained within General Statutes § 1-19 (c), which provides in relevant part: "Notwithstanding the provisions of subdivision (1) of subsection (b) of [§ 1-19], disclosure shall be required of [certain documents] comprising part of the process by which governmental decisions and policies are formulated." This language suggests, in comparison to § 1-20b, that the legislature knew how to describe a narrow limit on the disclosure exemptions in § 1-19 (b). Consequently, we read the emphasized language of § 1-20b, namely, *"[n]otwithstanding any provision of the general statutes to the contrary,"* as indicative of a legislative intent that § 1-20b constitutes a broad exception to the disclosure requirements of § 1-19.

[16] General Statutes § 54-142a provides: "ERASURE OF CRIMINAL RECORDS. (a) Whenever in any criminal case, on or after October 1, 1969, the accused, by a final judgment, is found not guilty of the charge or the charge is dismissed, all police and court records and records of any state's attorney pertaining to such charge shall be erased upon the expiration of the time to file a writ of error or take an appeal, if an appeal is not taken, or upon final determination of the appeal sustaining a finding of not guilty or a dismissal, if an appeal is taken. Nothing in this subsection shall require the erasure of any record pertaining to a charge for which the defendant was

part of chapter 961a of the General Statutes, requires that *all* police and court records and records of any

found not guilty by reason of mental disease or defect or guilty but not criminally responsible by reason of mental disease or defect.

"(b) Whenever in any criminal case prior to October 1, 1969, the accused, by a final judgment, was found not guilty of the charge or the charge was dismissed, all police and court records and records of the state's or prosecuting attorney or the prosecuting grand juror pertaining to such charge shall be erased by operation of law and the clerk or any person charged with the retention and control of such records shall not disclose to anyone their existence or any information pertaining to any charge so erased; provided nothing in this subsection shall prohibit the arrested person or any one of his heirs from filing a petition for erasure with the court granting such not guilty judgment or dismissal, or, where the matter had been before a municipal court, a trial justice, the circuit court or the court of common pleas with the records center of the judicial department and thereupon all police and court records and records of the state's attorney, prosecuting attorney or prosecuting grand juror pertaining to such charge shall be erased. Nothing in this subsection shall require the erasure of any record pertaining to a charge for which the defendant was found not guilty by reason of mental disease or defect.

"(c) Whenever any charge in a criminal case has been nolled in the superior court, or in the court of common pleas, if at least thirteen months have elapsed since such nolle, all police and court records and records of the state's or prosecuting attorney or the prosecuting grand juror pertaining to such charge shall be erased. However, in cases of nolles entered in the superior court, court of common pleas, circuit court, municipal court or by a justice of the peace prior to April 1, 1972, such records shall be deemed erased by operation of law and the clerk or the person charged with the retention and control of such records shall not disclose to anyone their existence or any information pertaining to any charge so erased, provided nothing in this subsection shall prohibit the arrested person or any one of his heirs from filing a petition to the court or to the records center of the judicial department, as the case may be, to have such records erased, in which case such records shall be erased. Whenever any charge in a criminal case has been continued at the request of the prosecuting attorney, and a period of thirteen months has elapsed since the granting of such continuance during which period there has been no prosecution or other disposition of the matter, the charge shall be construed to have been nolled as of the date of termination of such thirteen-month period and such erasure may thereafter be effected or a petition filed therefor, as the case may be, as provided in this subsection for nolled cases.

"(d) Whenever prior to October 1, 1974, any person who has been convicted of an offense in any court of this state has received an absolute pardon for such offense, such person or any one of his heirs may, at any time subsequent to such pardon, file a petition with the superior court at the

state's attorney pertaining to charges that have been dismissed must be erased, and the disclosure of such records by judicial or law enforcement personnel is pro-

location in which such conviction was effected, or with the superior court at the location having custody of the records of such conviction or with the records center of the judicial department if such conviction was in the court of common pleas, circuit court, municipal court or by a trial justice court, for an order of erasure, and the superior court or records center of the judicial department shall direct all police and court records and records of the state's or prosecuting attorney pertaining to such case to be erased. Whenever such absolute pardon was received on or after October 1, 1974, such records shall be erased.

"(e) The clerk of the court or any person charged with retention and control of such records in the records center of the judicial department or any law enforcement agency having information contained in such erased records shall not disclose to anyone, except the subject of the record, upon submission pursuant to guidelines prescribed by the office of the chief court administrator of satisfactory proof of the subject's identity, information pertaining to any charge erased under any provision of this section and such clerk or person charged with the retention and control of such records shall forward a notice of such erasure to any law enforcement agency to which he knows information concerning the arrest has been disseminated and such disseminated information shall be erased from the records of such law enforcement agency. Such clerk or such person, as the case may be, shall provide adequate security measures to safeguard against unauthorized access to or dissemination of such records or upon the request of the accused cause the actual physical destruction of such records. No fee shall be charged in any court with respect to any petition under this section. Any person who shall have been the subject of such an erasure shall be deemed to have never been arrested within the meaning of the general statutes with respect to the proceedings so erased and may so swear under oath.

"(f) Upon motion properly brought, the court or a judge thereof, if such court is not in session, may order disclosure of such records (1) to a defendant in an action for false arrest arising out of the proceedings so erased or (2) to the prosecuting attorney and defense counsel in connection with any perjury charges which the prosecutor alleges may have arisen from the testimony elicited during the trial. Such disclosure of such records is subject also to any records destruction program pursuant to which the records may have been destroyed. The jury charge in connection with erased offenses may be ordered by the judge for use by the judiciary, provided the names of the accused and the witnesses are omitted therefrom.

"(g) The provisions of this section shall not apply to any police or court records or the records of any state's attorney or prosecuting attorney with respect to any count of any information or indictment which was nolled if the accused was convicted upon one or more counts of the same information or indictment."

hibited by that statute. See *State* v. *Morowitz,* 200 Conn. 440, 450, 512 A.2d 175 (1986). Consequently, if the language in § 1-20b, "any record of the arrest of any person," does not include an arrest report, then the language referring to the exception for records erased pursuant to chapter 961a would have been unnecessary. See *Board of Education* v. *Freedom of Information Commission,* 217 Conn. 153, 160, 585 A.2d 82 (1991) (no part of a statute should be treated as insignificant or unnecessary).

Having established that the first sentence of § 1-20b includes an arrest report, we turn to the second sentence of that provision. The first sentence of § 1-20b cannot be read in isolation from the second sentence of that provision. See *Peck* v. *Jacquemin,* 196 Conn. 53, 68–73, 491 A.2d 1043 (1985). The second sentence limits the language of the first sentence by limiting the "record of the arrest of any person"—which we interpret to include an arrest report—to the "name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested." We conclude that this language must be read as a limitation on the broad disclosure requirement of the first sentence, because otherwise it would have been unnecessary for the legislature to have included such language. See *Board of Education* v. *Freedom of Information Commission,* supra. Moreover, this reading is consistent with the rule of statutory construction known as expressio unius est exclusio alterius; see, e.g., *Chairman* v. *Freedom of Information Commission,* supra, 200; which may be translated as "the expression of one thing is the exclusion of another." Black's Law Dictionary (6th Ed. 1990).

In light of our linguistic analysis of both sentences, read together, we conclude that § 1-20b exclusively regulates the disclosure of arrest reports, and obligates a police department to disclose such a report only to

the extent provided by the second sentence of that provision. This conclusion is buttressed by reference to the legislative history of that section.

The legislature enacted § 1-20b in response to a growing concern that certain police departments were refusing to disclose even the names of persons who had been arrested by officers of those departments. See 26 H.R. Proc., Pt. 8, 1983 Sess., p. 2772, remarks of Representative Richard D. Tulisano ("The purpose of the bill before us [is] to make sure when somebody was booked there would be no way that that could be hidden from the public. That everyone should know who's, in fact, been booked and put under custody."). Section 1-20b, as enacted, implements this purpose because it obligates the disclosure of the name of any person who has been arrested.

At the same time, however, we read this legislative history to support our interpretation that § 1-20b does not require disclosure of an arrest report beyond the limited information listed in the second sentence of that provision. When the bill was drafted and debated, the legislature specifically addressed the issues and policy concerns related to the disclosure of arrest reports. In this regard, the legislative history indicates that the legislature, although addressing the problem of so-called "secret arrests," intended to limit the extent to which police were obligated to disclose an arrest report.

First, as the provision was originally introduced in the House of Representatives, the bill provided in relevant part: "Notwithstanding any provision of the general statutes to the contrary, any record of the arrest of any person, other than a juvenile, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19 of the general statutes." 1983 Substitute House Bill No. 5111. This ver-

sion of the bill, notably, did not contain any language limiting the provision to the "name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested."

The House then amended the bill to read in relevant part: "Notwithstanding any provision of the general statutes to the contrary, any *police blotter entry recording* the arrest of any person, other than a juvenile, shall be a public record from the time of such *entry* and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19 of the general statutes." (Emphasis added.) 1983 Substitute House Bill No. 5111, § 1, as amended by House Amendment Schedule A. In favorably commenting on the amendment, Representative Francis X. O'Neill, Jr., stated: "Many years ago . . . in my years in . . . law enforcement, a record of an arrest included the affidavit to support an arrest, the arrest warrant itself, and the blotter record entry. If the bill, as written, went through, it would completely destroy every single undercover activity that any police department in this state attempted to go into. It would destroy all informants; quite frankly, it could be called a murder bill. It would kill informants. I personally have taken informants off meat racks who were dead. I have personally taken informants out of automobiles who were dead. They were police officers. They were individuals whose names had been disclosed either intentionally or unintentionally. A police officer puts his life on the line; this particular amendment would save their lives." 26 H.R. Proc., Pt. 8, 1983 Sess., pp. 2772-73.

This history suggests that, when the legislature considered passage of this bill, it was particularly cognizant of the policy concerns that militate against disclosure of arrest reports. Although the Senate rejected House Amendment A, the Senate later added language to the provision that is the functional equivalent of the "police

blotter entry recording of the arrest" language of House Amendment A, namely, the "name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested."[17] We read this history, therefore, as strong evidence that the legislature intended by the enactment of § 1-20b to ensure that certain minimal information regarding arrests be disclosed by the police, but, at the same time, to ensure that the disclosure requirement did not include the entire arrest report.

In sum, we read § 1-20b as a salient example of the maxim of statutory construction that specific language covering the given subject matter, namely, the disclosure requirements for arrest reports, will prevail over general language of the same or another statute that might otherwise prove controlling. See *Gaynor* v. *Union Trust Co.,* supra, 476–77; *Galvin* v. *Freedom of Information Commission,* supra, 456. That is what the legislature must have intended by stating: *"Notwith-*

---

[17] Specifically, the Senate replaced House Amendment A with Senate Amendment A to Substitute House Bill No. 5111, which provided in relevant part: "Notwithstanding any provision of the general statutes to the contrary, any record of the arrest of any person, other than a juvenile, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19 of the General Statutes. For the purposes of this section, 'record of the arrest' means the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested."

In commenting on Senate Amendment A, Senator Howard T. Owens, Jr., stated: "The amendment really sets forth and clarifies the record that has to be set forth as meaning the arrest, the date, time and place of it as opposed to a blotter entry. I think it clarifies the bill and improves it substantially." 26 S. Proc., Pt. 7, 1983 Sess., p. 2293.

Senate Amendment A was later replaced with Senate Amendment B, which retained the specific definition of "record of arrest" from Senate Amendment A but also added the exception for records erased pursuant to chapter 961a of the General Statutes. The bill was sent back to the House of Representatives for approval, and subsequently was passed by both chambers. See Public Acts 1983, No. 83-272.

*standing any provision of the general statutes to the contrary,* any record of the arrest of any person . . . shall be a public record . . . ." (Emphasis added.) General Statutes § 1-20b. This reading of this language, moreover, dovetails with the language of § 1-19 (a) that provides for disclosure "[e]xcept as otherwise provided by any . . . state statute." See footnote 5. Section 1-20b is such a "state statute."

Finally, our conclusion is supported by reference to § 1-19b (b), which provides in relevant part: "Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be deemed in any manner to . . . *affect the rights of litigants . . . under the laws of discovery of this state* . . . ." (Emphasis added.) As a general matter, it is undisputed that, absent an open file policy maintained by a state's attorney, a criminal defendant does not have immediate access to an arrest report. Such a report ordinarily need not be disclosed by the state except to the extent ordered by the court pursuant to the rules of discovery. See Practice Book §§ 746, 752 and 753; footnote 7; see also Practice Book §§ 740 through 745, 747, 749 through 750, and 754 through 755.[18]

---

[18] Practice Book § 741 provides: "INFORMATION AND MATERIALS DISCOVERABLE BY DEFENDANT AS OF RIGHT

"Upon a written motion made by a defendant within ten days after the entry of a plea, the prosecuting authority, within the time set by the judicial authority, shall disclose in writing the existence of and allow the defendant to inspect, copy, photograph and have reasonable tests made on any of the following relevant materials;

"(1) Exculpatory information or materials;

"(2) Books, tangible objects, papers, photographs, or documents obtained from or belonging to the defendant;

"(3) Adequately identified books, tangible objects, papers, photographs, or documents which are within the possession, custody, or control of any governmental agency, and which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial;

"(4) Copies of records or reports of physical or mental examinations of the defendant made in connection with the offense charged which are within

Public access to arrest reports while the prosecution
is pending would affect the rights of litigants under the

the possession, custody, or control of any governmental agency, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting authority, and which are obtainable with the permission of the defendant;

"(5) Copies of the defendant's prior criminal record, if any, which are within the possession, custody, or control of the state, the existence of which is known, or by the exercise of due diligence may become known, to the prosecuting authority;

"(6) Copies of results or reports of scientific tests, experiments or comparisons made in connection with the particular case which are known to and obtainable by the prosecuting authority and within the possession, custody, or control of any governmental agency, and which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial; or

"(7) Buildings, places, or portions thereof, which are in the possession, custody, or control of any governmental agency and which are material to the defense or about which the prosecuting authority intends to introduce evidence in chief at the trial.

"In addition to the foregoing, the defendant shall be entitled to disclosure of exculpatory materials in accordance with any applicable constitutional and statutory provisions."

Practice Book § 743 provides: "NAMES OF WITNESSES

"Upon motion made by the defendant, upon a showing of materiality to the preparation of the defense and a showing that the request is reasonable, the judicial authority may order the prosecuting authority at the commencement of trial to disclose to the defendant the names and addresses of all witnesses whom the prosecuting authority intends to call at trial, excluding those names already disclosed pursuant to Sec. 764. The fact that a witness' name is on a list furnished under this section shall not be a ground for comment upon a failure to call a witness."

Practice Book § 744 provides: "PRIOR RECORD OF WITNESSES

"After a witness called by the state has testified on direct examination, the prosecuting authority shall disclose any record of felony convictions of the witness known to the prosecuting authority and any record of felony or misdemeanor charges pending against the witness known to the prosecuting authority."

Practice Book § 745 provides: "ADDITIONAL DISCLOSURE

"In addition to any other disclosure or inspection permitted by these rules, the judicial authority may, upon motion of the defendant and a showing of good cause, order such other disclosure, inspection, testing or copying of specific information and materials as the interests of justice may require."

Practice Book § 747 provides: "SANCTIONS FOR FAILURE TO COMPLY

"If the prosecuting authority fails to comply with Sec. 740, the judicial authority may, on motion of the defendant or on his own motion, grant

laws of discovery because a defendant, as a member of the public, would have immediate access to docu-

appropriate relief, which may include one or more of the following:

"(1) Requiring the prosecuting authority to comply;

"(2) Granting the defendant additional time or a continuance;

"(3) Relieving the defendant from making a disclosure required by Sec. 756, prohibiting the prosecuting authority from introducing specified evidence, or dismissing the charges; or

"(4) Entering such other order as he deems proper."

Practice Book § 749 provides: "DEFINITION OF STATEMENT

"The term 'statement' as used in Sec. 748 means:

"(1) A written statement made by a person and signed or otherwise adopted or approved by him; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

Practice Book § 750 provides: "DISCOVERABLE AS OF RIGHT

"Subject to the provisions of Sec. 784, upon written motion of the defendant the prosecuting authority shall disclose to the defendant and allow the defendant to inspect, copy or photograph any of the following items which are known to him and obtainable by him in the exercise of due diligence:

"(1) Any relevant statements made by the defendant to any law enforcement officer of this state or his agent, or any copies of the same;

"(2) The substance of any oral declarations of the defendant of which a written or other tangible recording has been made and which were made by the defendant, whether before or after arrest, in response to interrogatories by any person then known to the defendant to be a law enforcement officer or his agent or a prosecuting authority or his agent; or

"(3) Any relevant statements of coconspirators which the prosecuting authority intends to offer in evidence at any trial or hearing."

Practice Book § 754 provides: "REQUEST FOR RECESS

"Whenever any statement is delivered to a defendant pursuant to Sec. 751, the judicial authority in his discretion, upon application of the defendant, may recess the proceedings for such time as he may determine to be reasonably required for the examination of such statement by the defendant and his preparation for its use in the trial."

Practice Book § 755 provides: "FAILURE TO COMPLY WITH ORDER

"If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

ments otherwise unavailable under our discovery rules. On the other hand, the state's attorney's rights would be adversely affected, because the defendant would have immediate access to documents upon which the prosecutor relies to make strategic decisions regarding the prosecution and to decide whether to request further investigation by the police.[19] Indeed, the commission itself has concluded that disclosure of arrest reports to criminal defendants while their prosecution is pending would conflict with the rules of discovery. See *McIntosh* v. *Chief of Police,* FOIC No. 91-11, p. 2 (September 25, 1991). In *McIntosh,* the commission denied the request of eight criminal defendants to compel disclosure of their arrest reports concluding that "an order of the commission requiring disclosure of the records requested by the complainant would affect the rights of litigants under the laws of discovery of this state."[20] Id.

In essence, the commission's claim, and the argument of the dissent, would transform the commission, an executive agency, into the overseer of criminal discov-

---

[19] In this regard, because we conclude on statutory grounds that disclosure of the arrest report was not required, we do not reach the plaintiffs' claim that the commission's decision would conflict with the rules of discovery thereby violating the separation of powers provision of article second of the Connecticut constitution.

[20] The commission claims in this court that disclosure of an arrest report during the pendency of the criminal prosecution does not conflict with General Statutes § 1-19b (b) because: (1) discovery rights exist only between the parties; and (2) the Windsor Locks police department, from whom the information was sought, was not a party to the criminal prosecution. We are unpersuaded. The plain language of § 1-19b (b) simply states that *nothing* in the act shall be deemed to affect the rights of litigants under the discovery laws of this state. As we previously stated, the state's attorney and the defendant are both litigants, and the commission's proposed interpretation of the act would directly affect their rights under the discovery rules. We fail to divine the significance of the fact that the request for disclosure was made to the police department when the police department necessarily acts in conjunction with the state's attorney with regard to the contents of the arrest report.

ery rules. In light of the clear expression of a contrary intent in § 1-20b, we decline to read the act so as to require such an extraordinary result.

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN, J., concurred.

BERDON, J., with whom KATZ, J., joins, dissenting. The issue before this court is whether incident reports prepared by the police are public records that come within the purview of General Statutes § 1-19 (a) of the Freedom of Information Act (act)[1] and are therefore open for inspection and copying by the public, including the press. Specifically at issue is the police incident report[2] prepared by a Windsor Locks police officer documenting the arrest of two teenagers involved in anti-Semitic and racist activities and the subsequent attempt by one of them to commit suicide. The majority, reading the act in a most restrictive manner, concludes that incident reports involving arrest are not required to be disclosed while the related criminal prosecution is pending. I disagree.

The majority travels a torturous path to reach its desired result. Today's holding violates fundamental principles to which we have long adhered. " 'When the words of a statute are plain and unambiguous, we need look no further for interpretive guidance because we

---

[1] See footnote 5 of the majority opinion.

[2] The majority confuses the issues by referring to the document sought to be disclosed as an "arrest report." Of course, this is an attempt to dovetail the report to come within the purview of General Statutes § 1-20. The incident report is entitled "Windsor Locks Police Incident Report" and is simply a report of an incident investigated by police. It may or may not include an arrest. Indeed, the disposition section of the report includes blocks to be checked which include "unfounded," "pending," "settled" and "juvenile." Nevertheless, since this case involves an arrest, I discuss an incident report which would include an arrest resulting from the incident.

assume that the words themselves express the intention of the legislature.' " *Southington* v. *State Board of Labor Relations,* 210 Conn. 549, 559, 556 A.2d 166 (1989). "It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." (Internal quotation marks omitted.) *State* v. *Hanson,* 210 Conn. 519, 529, 556 A.2d 1007 (1989). The legislature, not the majority of the court, determines the public policy of this state. See *International Business Machine Corporation* v. *Brown,* 167 Conn. 123, 134–35, 355 A.2d 236 (1974). These principles are not merely tenets that govern our review of statutory enactments, but they have their roots in our state constitution, which mandates the separation of powers between the coordinate branches of government. Conn. Const., art. II;[3] *Sassone* v. *Lepore,* 226 Conn. 773, 790, 629 A.2d 357 (1993) (*Berdon, J.,* dissenting.).

General Statutes § 1-19 (a) of the act provides that "all records maintained or kept on file by any public agency . . . shall be public records and every person shall have the right to inspect such records promptly . . . ." "Public agency" is defined in part as "any executive [or] administrative . . . office of . . . any city [or] town . . . ." General Statutes § 1-18a (a). It is clear that a police incident report is a record maintained by an agency of the town, and the majority concedes this much, albeit only for this decision.[4]

[3] The constitution of Connecticut, article second, as amended by article XVIII of the amendments to that constitution, provides: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another. The legislative department may delegate regulatory authority to the executive department; except that any administrative regulation of any agency of the executive department may be disapproved by the general assembly or a committee thereof in such manner as shall by law be prescribed."

[4] The majority assumes for purposes of this decision, but does not decide, that criminal arrest reports are records. If the majority is concerned about

Nonetheless, the majority points to prefatory language in § 1-19 (a) that excepts from its provisions the disclosure of records as "otherwise provided by any federal law or state statute" and then leaps to § 1-20b of the General Statutes. Section 1-20b requires, without condition, that records of arrest, other than juvenile records or criminal records that have been erased, must be disclosed. *For purposes of § 1-20b*, "record of the arrest" means "the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested." The majority therefore concludes that the required disclosure for an incident report involving an arrest is limited to the information set forth in § 1-20b.

This conclusion ignores a key piece of legislation. The majority never refers in its analysis to § 1-19 (b), which provides the following: "Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be construed to require disclosure of . . . (3) records of law enforcement agencies not otherwise available to the public which records were compiled in connection with the detection or investigation of crime, if the disclosure of said records would not be in the public interest because it would result in the disclosure of (A) the identity of informants not otherwise known, (B) information to be used in a prospective law enforcement action if prejudicial to such action, (C) investigatory techniques not otherwise known to the general public, (D) arrest records of a juvenile, which shall also include any investigatory files, concerning the arrest of such juvenile, compiled for law enforcement pur-

whether incident reports are records, they should state so and provide the reasons for their conclusion. We have an obligation to address the issues raised by the parties not only for the case before us, but in order to give appropriate guidance for future cases. The local police need to know, the state's attorney needs to know, the Freedom of Information Commission needs to know, the legislature needs to know and most important, the public needs to know.

poses, (E) the name and address of the victim of a sexual assault . . . or injury or risk of injury, or impairing of morals . . . or of an attempt thereof or (F) uncorroborated allegations subject to destruction pursuant to section 1-20c . . . ." Clearly, the Windsor Locks police department is a law enforcement agency.

If § 1-20b were controlling as to the limits of disclosure for incident reports, as the majority contends, the exclusions in § 1-19 (b) (3) would be rendered superfluous. When a statute is all-inclusive, as in the case of § 1-19 (a), and then provides specific exceptions, as in the case of § 1-19 (b), "[t]he careful delineation of the bounds of this exemption gives unusual force to the principle that the express mention in a statute of one exemption precludes reading others into it." *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 301, 57 A.2d 128 (1948); see also *Mad River Co.* v. *Wolcott,* 137 Conn. 680, 687, 81 A.2d 119 (1951). Likewise, the specific delineation of certain exemptions means that the exemptions cannot be ignored.

Accordingly, the majority cannot sweep § 1-19 (b) under the rug, but must read it in conjunction with § 1-20b and § 1-19 (a). In doing so, it must be recognized that there is nothing in § 1-20b that *limits* disclosure to this information only, rather it sets a bare minimum of information that *must* be disclosed. "When construing a statute, we do not interpret some clauses in a manner that nullifies others, but rather read the statute as a whole and so as to reconcile all parts as far as possible." (Internal quotation marks omitted.) *Iovieno* v. *Commissioner of Correction,* 222 Conn. 254, 258, 608 A.2d 1174 (1992).

Reading this body of law together, it is only logical to conclude from the plain language of the act that incident reports prepared and maintained by local police

must be disclosed unless one or more of the exceptions set forth in § 1-19 (b) (3) have been met. Even if one or more of the exceptions are met, however, at the very least there must be disclosure of the "record of arrest" (except for juvenile and erased records). As noted above, the record of the arrest includes "the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested." General Statutes § 1-20b.

Indeed, the legislative history of § 1-20b, which forms the basis for the majority's analysis, supports this conclusion. As Representative Richard D. Tulisano noted on the floor of the House of Representatives, "[t]he purpose of the bill before us [is] to make sure when somebody was booked there would be no way that that could be hidden from the public. That everyone should know who's, in fact, been booked and put under custody." 26 H.R. Proc., Pt. 8, 1983 Sess., p. 2772. Furthermore, the statutory language is consistent with the constitutional requirement of disclosure, as discussed, infra.

The majority also points to General Statutes § 1-19b (b), which provides that nothing in the act "shall be deemed in any manner to . . . *affect* the rights of litigants . . . under the laws of discovery of this state . . . ." (Emphasis added.) The majority claims that § 1-19b (b) makes it clear that criminal discovery shall not be affected by the act. They also conclude that disclosure of the incident report while the prosecution is pending would affect the rights of litigants under the laws of discovery because "a defendant, as a member of the public, would have immediate access to documents otherwise unavailable under our discovery rules."

The freedom of information commission (commission), however, never made a finding that disclosure of the incident report would affect the rights of anyone in this case. The commission has the exclusive juris-

diction, in the first instance, to make such a finding. See General Statutes § 1-21j. In fact, the commission specifically found that "under the facts of this case § 1-19b (b) . . . does not prohibit disclosure of the requested record," and that conclusion is not challenged on appeal. See *New Haven* v. *Freedom of Information Commission,* 205 Conn. 767, 535 A.2d 1297 (1988) (neither reviewing court nor trial court may retry case or substitute its judgment for that of the agency). There was no challenge to the commission's finding on the ground that it was not supported by substantial evidence. See *Briggs* v. *State Employees Retirement Commission,* 210 Conn. 214, 217, 554 A.2d 292 (1989).

In some cases, it may be that information in the arrest report should be withheld because the discovery rights of a litigant would be affected, but there must be a finding to that effect. On the other hand, in many cases the disclosure of a report may not affect the discovery rights of the litigants. The incident report may contain information known to both parties or the information may be readily available to anyone, in which case disclosure would have an inconsequential effect on the rules of discovery. For example, if the state's attorney's office has an "open door" policy for discovery, the disclosure of the information will hardly affect the rights of the litigants. The point is that these are fact bound issues to be resolved by the commission in the first instance.

Furthermore, the parties who sought the incident report in this case, the Journal Inquirer and its news editor, Robert H. Boone, are members of the public and the press. Their right to know cannot be controlled by some unknown future litigant whose rights may or may not be affected. See *In re Application of National Broadcasting Co.,* 635 F.2d 945, 953–54 (2d Cir. 1980) (television networks permitted to copy and televise videotapes introduced into evidence in previous crimi-

nal trial even though tapes were still subject to challenge by defendants on appeal and could be introduced in future trials against additional defendants).

Common sense dictates that the commission's order in this case must be upheld. This court is obligated to consider statutes " 'as a whole, with a view toward reconciling their separate parts in order to render a reasonable overall interpretation; the application, moreover, of common sense to the statutory language is not to be excluded. . . . We must avoid a consequence which fails to attain a rational and sensible result which bears most directly on the object which the legislature sought to obtain.' " *Builders Service Corporation* v. *Planning & Zoning Commission,* 208 Conn. 267, 276, 545 A.2d 530 (1988). In this case, the objective, simply stated, is public disclosure. *Superintendent of Police* v. *Freedom of Information Commission,* 222 Conn. 621, 626, 609 A.2d 998 (1992) (policy underlying the act favors disclosure of public records); *Hartford* v. *Freedom of Information Commission,* 201 Conn. 421, 430, 518 A.2d 49 (1986) (the act makes disclosure of public records the statutory norm.)

The legislative scheme under the act does not require a blanket disclosure of information, but instead seeks to accommodate nondisclosure when the public interest demands. Accordingly, § 1-19 (b) (3) lists the particular situations in which the public interest requires nondisclosure.[5] The exceptions, however, are limited to circumstances in which "the legislature has determined that [the] public interest overrides the public's right to know . . . ." *Lieberman* v. *State Board of*

---

[5] The trial court points out that there were 218,115 arrests in Connecticut in 1990, the year after the incident report at issue in this case was prepared. The trial court notes: "Assuming that the prosecution would raise the issue of prejudice in each case of warrantless arrests, the sheer volume of required hearings would render impotent two strategic public agencies of our state." This argument presupposes that all incident reports are

*Labor Relations,* 216 Conn. 253, 266, 579 A.2d 505 (1990). Such exceptions must be narrowly construed. *Board of Police Commissioners* v. *Freedom of Information Commission,* 192 Conn. 183, 188, 470 A.2d 1209 (1984).

Other jurisdictions have made it clear that "there is a strong public-policy interest favoring the inspection of public records. This public interest is particularly significant where arrest records are concerned." *Newspapers, Inc.* v. *Breier,* 89 Wis. 2d 417, 435–36, 279 N.W.2d 179 (1979). "The power to arrest is one of the most awesome weapons in the arsenal of the state. It is an awesome weapon for the protection of the people, but it is also a power that may be abused. . . . [C]urbing abuse of the arrest power is only possible if the public can learn how that power is exercised. The mere revelation that a person has been arrested does not make possible the public scrutiny of lawfulness or appropriateness of police conduct . . . ." Id., 436–37; see also *Houston Chronicle Publishing Co.* v. *Houston,* 531 S.W.2d 177 (Tex. Civ. App. 1975) (public's right to know is particularly sensitive and important regarding police activity); *Caledonian-Record Publishing Co.* v. *Walton,* 154 Vt. 15, 21, 573 A.2d 296 (1990) ("[p]ursuant to the First Amendment, it is generally recognized that the public and the media have a constitutional right of access to information relating to the activities of law enforcement officers and to information concerning crime in the community").

The majority's restrictive interpretation limiting disclosure of incident reports thwarts the underlying pur-

cloaked in secrecy, which is exactly what the act was designed to eliminate—the withholding of information from the public. When an office, such as a police department, has the unbridled discretion to withhold information, one can rest assured that the general rule will be to withhold the information, even if there is no compelling state reason to do so. Such a philosophy interferes with the public's right to know.

poses of the act. "The Freedom of Information Act expresses a strong legislative policy in favor of the open conduct of government and free public access to government records." *Wilson* v. *Freedom of Information Commission,* 181 Conn. 324, 328, 435 A.2d 353 (1980).[6] "[I]t is well established that the general rule under the Freedom of Information Act is disclosure, any exception to that rule will be narrowly construed in light of the general policy of openness expressed in the [act]. . . . The burden of proving the applicability of an exception to the [act] rests upon the party claiming it." (Citation omitted; internal quotation marks omitted.) *Ottochian* v. *Freedom of Information Commission,* 221 Conn. 393, 398, 604 A.2d 351 (1992).

In the present case, the public had a right to know the details of the arrest of the two teenagers by the Windsor Locks police department. The incident report described the arrest as follows: The teenagers harassed and threatened the owner of a grinder sandwich shop in his place of business. They also flashed a knife at the store owner and accused him of being a drug dealer. Shortly afterward, the teenagers were apprehended by the police while they were distributing racist and anti-Semitic leaflets. One of them attempted to commit suicide while in police custody. The public's right to know

---

[6] Senator Robert L. Julianelle, then cochairman of the Government Administration and Policy Committee, summed up the beneficial purposes of the act in his remarks before the Senate as follows: "The legislature finds and declares that . . . the people have a right to be fully informed of the actions taken by public agencies in order that they may retain control over the instruments they have created; that the people do not yield their sovereignty to the agencies which serve them; that the people in delegating authority do not give their public servants the right to decide what is good for them to know and that it is the intent of the law that actions taken by public agencies be taken openly and . . . that the record of all public agencies be open to the public except in those instances where a superior public interest requires confidentiality." 18 S. Proc., Pt. 5, 1975 Sess., pp. 2323–24.

this information was not satisfied until months after the incident, when the report was finally released.

Applying the majority's interpretation of the act to the facts of this case, the only information that would have been available to the public while the criminal charges were pending would have been the names and addresses of the teenagers, the date, time and place of the incident, and the fact that they were arrested for violation of General Statutes § 53a-64 (reckless endangerment in the second degree), § 53a-181 (breach of the peace), and § 53a-167a (interfering with a police officer). Nothing more would have been disclosed.

To understand fully the ramifications of the majority's restrictions on the right to know, substitute for the teenagers the mayor of a city. Does the majority contend that the public would be entitled to know only the mayor's name and address, the date, time and place of the incident, and the statutory section of the offense that he allegedly committed? If we were to substitute a well known dissident for the teenagers or the mayor, would we tolerate that person's arrest without more information made available to the public? I hope not. Public disclosure of the incident report simply involves an aspect of government that distinguishes a democracy from a totalitarian state. For precisely this reason, the restrictive interpretation of the majority would violate first amendment protections. Justice T. Clark Hull, writing for a unanimous court, recently stated: "We note that the [act's] general policy favoring public access has strong federal constitutional underpinnings. As the United States Supreme Court has made clear, the first amendment to the federal constitution is not limited to protection of free expression but also embodies the right to receive and gain access to information and ideas. See *Press-Enterprise Co.* v. *Superior Court,* 464 U.S. 501, 508–10, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984); *Globe Newspaper Co.* v. *Supe-*

*rior Court,* 457 U.S. 596, 606–607, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982); *Nixon* v. *Warner Communications, Inc.,* 435 U.S. 589, 597–98, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978). '[A]n arbitrary interference with access to important information is an abridgement of the freedoms of speech and of the press protected by the First Amendment.' *Richmond Newspapers, Inc.* v. *Virginia,* 448 U.S. 555, 583, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980) (Stevens, J., concurring.)." *Lieberman* v. *State Board of Labor Relations,* supra, 267–68; see also Conn. Const., art. I, §§ 4 and 5;[7] *Dow* v. *New Haven Independent, Inc.,* 41 Conn. Sup. 31, 43–44, 549 A.2d 683 (1988). Furthermore, "[t]he state constitution provides that our government is to be responsible to the people. Conn. Const., art. I, § 2." *Lieberman* v. *State Board of Labor Relations,* supra, 265.

I believe that the plain language of the act requires public disclosure of an incident report prepared by the police at the time it is made unless the police can demonstrate the need for nondisclosure under § 1-19 (b). Anything less would run afoul of our state and federal constitutions.

In *United States Department of Justice* v. *Reporters Committee,* 489 U.S. 749, 772, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989), the United States Supreme Court noted the following: "In our leading case on the [federal Freedom of Information Act], we declared that the Act was designed to create a broad right of access to 'official information.' *EPA* v. *Mink,* 410 U.S. 73, 80 [93 S. Ct. 827, 35 L. Ed. 2d 119] (1973)." Dissenting in *Mink,* Justice Douglas characterized the philosophy of the statute by quoting Henry Steele Commager

---

[7] Article first, § 4, of the Connecticut constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

Article first, § 5, of the Connecticut constitution provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press."

as follows: " 'The generation that made the nation thought secrecy in government one of the instruments of Old World tyranny and committed itself to the principle that a democracy cannot function unless the people are permitted to know *what their government is up to.*' " (Emphasis added.) Id., 105. The basic policy of requiring full agency disclosure unless information is exempted under clearly delineated statutory language indeed focuses on the citizens' right to know. We, in Connecticut, likewise have a right to know what our government is up to.

Accordingly, I dissent.

