******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COMMISSIONER OF PUBLIC SAFETY *v.*
FREEDOM OF INFORMATION
COMMISSION ET AL.
(SC 19047)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued January 9—officially released July 15, 2014*

*Victor R. Perpetua*, principal attorney, with whom, on the brief, was *Colleen Murphy*, general counsel, for the appellant (named defendant).

*Terrence M. O'Neill*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Holly Hutton*, certified legal intern, for the appellee (plaintiff).

*Daniel J. Klau*, supervising attorney, and *Maxwell Mishkin*, *James Shih* and *Joshua Weinger*, legal interns, filed a brief for the Connecticut Council on Freedom of Information et al. as amici curiae.

*Opinion*

ROBINSON, J. This certified appeal raises significant questions about the breadth and extent of a law enforcement agency's disclosure obligations under the Freedom of Information Act (act), General Statutes § 1-200 et seq.,[1] with respect to a pending criminal prosecution. In 1993, this court held in *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 653–61, 631 A.2d 252 (1993), that during a pending criminal prosecution, a law enforcement agency's disclosure obligations under the act were exclusively governed by the statutory predecessor to General Statutes § 1-215,[2] which required the agency to release, at that time, only what is commonly known as the police blotter information, namely, "the 'name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested.' " Id., 658. The legislature responded to *Gifford* by enacting Public Acts 1994, No. 94-246, § 13,[3] which amended General Statutes (Rev. to 1993) § 1-20b, the statutory predecessor to § 1-215, to require the police to designate for release, in addition to the police blotter information, "at least one of the following . . . the arrest report, incident report, news release or other similar report of the arrest of a person." See footnote 2 of this opinion. In this appeal, we must determine whether the enactment of Public Act 94-246 legislatively overruled this court's temporal conclusion in *Gifford*, namely, that during pending criminal prosecutions, law enforcement agencies' disclosure obligations under the act are exclusively governed by § 1-215, rendering the act's broader disclosure requirement and law enforcement exception, set forth in General Statutes (Supp. 2014) § 1-210 (a) and (b) (3) respectively,[4] inapplicable from the time of arrest to the conclusion of the prosecution.

The defendant, the Freedom of Information Commission (commission), appeals, upon our grant of its petition for certification,[5] from the judgment of the Appellate Court affirming the trial court's judgment sustaining the administrative appeal of the plaintiff, the Commissioner of the Department of Public Safety (department),[6] from the commission's decision finding that the department had violated the act by failing to disclose to the complainants[7] certain records from a pending criminal case. *Commissioner of Public Safety* v. *Freedom of Information Commission*, 137 Conn. App. 307, 308–309, 48 A.3d 694 (2012). Supported by the amici curiae,[8] the commission claims that the Appellate Court improperly concluded that the enactment of Public Act 94-246 did not affect aspects of this court's decision in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641, holding that § 1-215 exclusively governed law enforcement agencies' disclosure obligations under the act during pending criminal prosecutions, because: (1) that construction is contrary

to the plain language and legislative history of the statute, particularly the reference in § 1-215 (a) providing that "disclosure of data or information other than [the police blotter information] set forth in [§ 1-215 (b) (1)] . . . shall be subject to the provisions of [§ 1-210 (b) (3)]"; and (2) the commission's interpretation of the act to the contrary is time-tested and reasonable and, therefore, entitled to deference from the courts. We conclude that Public Act 94-246 responded to *Gifford* by increasing law enforcement agencies' disclosure obligations under § 1-215, but did not disturb the holding in *Gifford* that § 1-215 exclusively governs law enforcement agencies' disclosure obligations under the act during pending criminal prosecutions, to the exclusion of the act's broader disclosure obligations set forth in § 1-210 (a), as cabined by the law enforcement exception, set forth in § 1-210 (b) (3). On the basis of the ample extratextual evidence of the meaning of the otherwise ambiguous § 1-215, we further conclude that the commission's construction of the statute to the contrary is not reasonable and, therefore, is not entitled to judicial deference. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court's opinion aptly sets forth the relevant facts and procedural history. "On March 18, 2008, the complainants requested, pursuant to the [act] . . . that the department provide them with access to the police report of an incident that occurred on March 15, 2008, in Derby. The request concerned the arrest of an individual who . . . was charged with assault in the first degree of an elderly person and attempt to commit murder. On April 29, 2008, the department responded by letter indicating that the entire report was exempt from disclosure pursuant to § 1-215; however, the department provided the complainants with a copy of the official department . . . press release pertaining to the incident that was the subject of their inquiry. The press release contained the following information: the accused's name was Toai T. Nguyen, he lived at 59 Grove Street, Shelton, and was born on March 4, 1973; the date, time and location of the incident was March 15, 2008, at 1:01 p.m. on Route 8, northbound, exit seventeen off ramp in Derby; and the charges upon which the accused had been arrested were: assault in the first degree of an elderly person in violation of General Statutes § 53a-59a, attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a, and failure to respond/plea in violation of General Statutes § 51-164r (a). The press release also contained a two paragraph narrative that included additional information about the arrest.

"On May 2, 2008, the complainants appealed from the decision of the department to the commission pursuant to General Statutes § 1-206 (b) (1). On March 6, 2009, following a hearing, a decision by a hearing officer, and a proceeding before the full commission, the

commission issued a final decision. In that decision, the commission concluded, among other things, that § 1-215 'does not exempt records from public disclosure under the [act], but rather mandates that, at a minimum, certain arrest records must be disclosed. In instances where a public agency seeks to withhold other records not mandated to be disclosed pursuant to § 1-215 . . . such public agency must prove that an exemption applies to such other records.' The commission also found 'that the [department] did make available to the [complainants] a press release concerning the arrest of [Nguyen], which included the name and address of [Nguyen], the date, time and place of his arrest and the offense for which he was arrested.' The commission then concluded 'that the [department] provided the 'record of arrest' within the meaning of § 1-215 . . . .'

"The commission issued the following orders: 'Forthwith the [department] shall provide to the [complainants] copies of the in camera records other than the portions described in paragraphs 16, 25, 38 and 39 of the findings, above. . . . Consistent with [the commission's] precedent, the [department] may redact social security numbers from the records ordered released.'

"On March 12, 2009, the department filed an appeal with the trial court. On March 12, 2010, the commission informed the court that the criminal defendant had entered a guilty plea and the criminal matter therefore had concluded. The department then made all relevant documents available to the complainants. The court issued its memorandum of decision on April 21, 2010. The court agreed with both parties that the issue of the availability of the exception to the act provided by § 1-215 was moot, but because it was capable of repetition, yet evading review, the case could still go forward. The court also concluded that there was more than one reasonable interpretation of § 1-215, and therefore it consulted legislative history. The court stated that its conclusion from reviewing the legislative history 'agrees with the [department's] position—that while *Gifford* [v. *Freedom of Information Commission*, supra, 227 Conn. 641] had restricted disclosure to mere nominal information, the legislative revision had compromised on increasing the mandatory disclosure by police departments of arrest information by requiring the police department to disclose at least *one* of the four items listed in § 1-215 (b) (2). Thus, [the department] here satisfied the act by choosing to provide the complainants with the news release, and was not obligated to make either a full or redacted police report available.' " (Citation omitted; emphasis in original.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, supra, 137 Conn. App. 309–11.

The commission appealed from the judgment of the trial court sustaining the department's administrative appeal to the Appellate Court. Id., 311. In a unanimous

opinion, the Appellate Court concluded that, when § 1-215 is considered in light of this court's interpretation of that statute in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641, and other related statutes, "there is only one plausible meaning of the statutory language. Therefore, we conclude that the statute's language is plain and unambiguous. . . . Because . . . the plain language of the statute requires only the disclosure of the police blotter information of § 1-215 (b) (1) and an additional piece of information contained in § 1-215 (b) (2), we also must conclude that the court did not err in its conclusion that the news release disclosed by the department met the requirements of the statute." (Footnote omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, supra, 137 Conn. App. 322–23. In particular, the Appellate Court observed that, although the amendment of the statute in 1994 "clearly overrules the *Gifford* court's holding that all § [1-215] required was the disclosure of the police blotter information," it did not void "the *Gifford* court's reasoning that . . . § 1-215, exclusively regulates the disclosure of records of law enforcement agencies . . . ."[9] Id., 321. This certified appeal followed. See footnote 5 of this opinion.

On appeal, the commission contends that the Appellate Court improperly: (1) interpreted § 1-215; and (2) failed to defer to the commission's reasonable, time-tested interpretation of that statute. We address each claim in turn.[10]

I

STATUTORY CONSTRUCTION OF § 1-215

We begin with the commission's claim that the Appellate Court's interpretation of § 1-215 is inconsistent with the statute's plain and unambiguous text, as well as the relevant legislative history. With respect to the plain language, the commission contends that the text of the statute indicates that it governs only the disclosure of "the record of the arrest," which is a term specifically defined by § 1-215 (b) to include the police blotter information in § 1-215 (b) (1) and an additional item listed in § 1-215 (b) (2). As a corollary, the commission contends that the disclosure of all other law enforcement records "outside the ambit" of § 1-215, such as mug shots, documentary evidence, witness statements, and other reports, is governed by § 1-210 (a) and (b) (3). (Emphasis omitted.) Thus, the commission contends that the reference in § 1-215 (a) to the law enforcement exception, § 1-210 (b) (3), is intended to indicate that § 1-210 (b) (3) governs law enforcement disclosure obligations for all material except for the police blotter information defined under § 1-215 (b) (1). The commission also contends that the legislature enacted the statutory language at issue in 1994 to overrule this court's interpretation of the statute's predecessor in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 653–62,

and that § 1-215 imposes a minimum level of disclosure at the time of arrest, without affecting law enforcement agencies' existing obligations under § 1-210 (a) and (b) (3). To this end, the commission emphasizes that it is not arguing that "additional disclosures must be made, but [rather] that law enforcement agencies must be required to articulate a factual and legal reason why such disclosures would be prejudicial to a pending prosecution or are otherwise permissibly exempt from disclosure under § 1-210 (b) (3)."[11] In sum, the commission asks us to determine whether "good public policy supports an absolute exclusion from review of any law enforcement records during a criminal prosecution, once the minimal police blotter and press release disclosures have been made."[12]

In response, the department contends that the Appellate Court properly determined that § 1-215 plainly and unambiguously prescribes a law enforcement agency's exclusive disclosure obligations under the act during a pending prosecution, limiting that disclosure to the police blotter information under § 1-215 (b) (1) and one of the items prescribed in subsection (b) (2). According to the department, "nothing in the statute compels a law enforcement agency to release all documents relating to an arrest." Relying on the language in § 1-215 (b) (2) authorizing law enforcement agencies to "designat[e]" the additional item to be disclosed beyond the blotter information, the department cites the commission's interpretation of § 1-215 in *Green* v. *Hartford Police Dept.*, Freedom of Information Commission, Docket No. FIC 1998-029 (July 22, 1998), and argues that the statute gives law enforcement agencies "exclusive discretion in choosing which source of additional information to disclose" under § 1-215 (b) (2). To this end, the department contends that the reference in § 1-215 (a) to the law enforcement exception, set forth in § 1-210 (b) (3), does not indicate that § 1-210 (b) (3) governs law enforcement agencies' disclosure obligations beyond those documents that comprise the " 'record of the arrest' " defined by § 1-215 (b), but rather, guides the agency in the exercise of its discretion while supplying the additional item required by § 1-215 (b) (2), by authorizing the redaction or withholding of certain sensitive information.[13] The department then claims that, even assuming that we deem § 1-215 to be ambiguous, the relevant legislative history supports the Appellate Court's interpretation, and suggests that the legislature enacted Public Act 94-246 as a compromise measure, and "did not intend to make substantial changes to the statutory language litigated in *Gifford*," by requiring law enforcement agencies to release a "salient" narrative along with the basic blotter information. We agree with the department, and conclude that, even after the legislature's post-*Gifford* amendments in 1994, § 1-215 continues to provide the exclusive disclosure obligation under the act for law enforcement agencies with respect

to documents relating to a pending criminal prosecution.

"This court reviews the trial court's judgment pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. Under the UAPA, it is [not] the function . . . of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Even for conclusions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse if its discretion. . . . [Thus] [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . [Similarly], this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . Cases that present pure questions of law, however, invoke a broader standard of review than is . . . involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Citation omitted; internal quotation marks omitted.) *Chairperson, Connecticut Medical Examining Board* v. *Freedom of Information Commission*, 310 Conn. 276, 281–82, 77 A.3d 121 (2013). Even if time-tested, we will defer to an agency's interpretation of a statute only if it is "reasonable"; that reasonableness is determined by "appl[ication of] our established rules of statutory construction." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *State Board of Labor Relations*, 296 Conn. 594, 599, 996 A.2d 729 (2010).

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and

unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Chairperson, Connecticut Medical Examining Board* v. *Freedom of Information Commission*, supra, 310 Conn. 283. The question of statutory interpretation presented in this case is a question of law subject to plenary review. See id., 282–83.

A

Background: *Gifford* v. *Freedom of Information Commission*

"[I]n interpreting [statutory] language . . . we do not write on a clean slate, but are bound by our previous judicial interpretations of this language and the purpose of the statute." *New England Road, Inc.* v. *Planning & Zoning Commission*, 308 Conn. 180, 186, 61 A.3d 505 (2013). Thus, determining the meaning and purpose of § 1-215 must begin with a detailed review of this court's 1993 decision in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641, which provided the impetus for the legislature's enactment of the statutory language at issue in this appeal. In *Gifford*, this court considered "whether a municipal police department arrest report must be disclosed by the police department to the public, pursuant to the [act] . . . while the criminal prosecution that is related to the arrest report is pending." (Citation omitted.) Id., 642. Assuming that an arrest report is a public record subject to the act, the court determined that the 1993 revision of the predecessor statute to § 1-215[14] "does not mandate disclosure of an arrest report in these circumstances," specifically, "while the criminal prosecution related to the report is pending."[15] Id., 653. The court first parsed the statute's language in detail, determining that a phrase in its first sentence, " '[n]otwithstanding any provision of the general statutes to the contrary,' " demonstrates that "a document falling within this section that would otherwise be governed by other portions of the act, or by any other provision of the General Statutes, is nonetheless governed, *not by those other provisions, but by this provision*." (Emphasis altered; footnotes omitted.) Id., 654. The court stated that the statute's "first sentence . . . by itself, establishes a broad disclosure requirement" with respect to arrest reports; id., 655; but it "cannot be read in isolation from the second sentence of that provision. . . . *The second sentence limits the language of the first sentence by limiting the 'record of the arrest of any person'—which we interpret to include an arrest report—to the 'name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested.*' We conclude that this language must be read

as a limitation on the broad disclosure requirement of the first sentence, because otherwise it would have been unnecessary for the legislature to have included such language. . . . Moreover, this reading is consistent with the rule of statutory construction known as expressio unius est exclusio alterius . . . which may be translated as 'the expression of one thing is the exclusion of another.' " (Citations omitted; emphasis added.) Id., 658. Thus, the court concluded that § 1-215 "*exclusively regulates the disclosure of arrest reports*, and obligates a police department to disclose such a report only to the extent provided by the second sentence of that provision." (Emphasis added.) Id., 658–59; see also id., 661 (describing § 1-215 as "salient example of the maxim of statutory construction that specific language covering the given subject matter, namely, the disclosure requirements for arrest reports, will prevail over general language of the same or another statute that might otherwise prove controlling"). The court further noted that this reading "dovetails" with the language of § 1-210 (a), which provides for disclosure " '[e]xcept as otherwise provided by any . . . state statute,' " and noted that § 1-215 is such a " 'state statute.' "[16] Id., 662.

In responding to the dissenting justices' argument that its interpretation of § 1-215 rendered superfluous the law enforcement exceptions set forth in § 1-210 (b) (3) to the general disclosure obligation under § 1-210 (a) of the act,[17] the majority of this court in *Gifford* "recognize[d] that the language of § [1-210] (b) (3) . . . could be interpreted to include arrest reports. This language, however, does not explicitly include a reference to arrest reports, and could be interpreted to cover other documents besides arrest reports that are maintained by a law enforcement agency and are not otherwise available to the public. Although there is no need to hypothesize what other documents may be covered by § [1-210] (b) (3), we conclude that the explicit reference to arrest reports in § [1-215] removes such documents from the coverage of § [1-210] (b) (3), and provides both the disclosure obligations for such reports and the appropriate limitations on that disclosure. As a result, our interpretation does not render § [1-210] (b) (3) superfluous because, absent some other statutory provision shielding law enforcement documents from disclosure, that provision continues to regulate the disclosure of law enforcement documents *other than arrest reports during the pendency of a criminal case*."[18] (Citation omitted; emphasis altered.) Id., 654–55 n.14.

## B

### Textual Analysis

Bearing in mind this court's interpretation of its predecessor in *Gifford*, we turn to the text of § 1-215, which provides: "(a) *Notwithstanding any provision of the*

*general statutes to the contrary*, and except as otherwise provided in this section, any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, *shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-212 and subsection (a) of section 1-210, except that disclosure of data or information other than that set forth in subdivision (1) of subsection (b) of this section shall be subject to the provisions of subdivision (3) of subsection (b) of section 1-210.* Any personal possessions or effects found on a person at the time of such person's arrest shall not be disclosed unless such possessions or effects are relevant to the crime for which such person was arrested.

"(b) For the purposes of this section, 'record of the arrest' means (1) the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested, and (2) *at least one of the following, designated by the law enforcement agency*: The arrest report, incident report, news release or other similar report of the arrest of a person." (Emphasis added.)

In contrast to the Appellate Court, we agree with the trial court that both parties' proffered interpretations of § 1-215, when read in the context of related statutes, including § 1-210, in accordance with § 1-2z, are reasonable and that the statutory scheme is, therefore, ambiguous. Specifically, we deem plausible the commission's reading of the statute's plain language, which suggests that § 1-215 pertains only to defined arrest records in particular and that the disclosure of other records of law enforcement agencies—including those that pertain to pending prosecutions—are governed by § 1-210 (a), as cabined by the law enforcement exceptions set forth in § 1-210 (b) (3). This is particularly so given the lack of statutory language in § 1-215 expressly referring to pending criminal prosecutions. We also find reasonable, however, the department's reading of the statutory text, namely, that § 1-215 exclusively governs disclosure under the act of law enforcement agencies' records during pending criminal prosecutions, particularly in light of this court's interpretation of identically worded aspects of the statutory predecessor to § 1-215 in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641. That reading would render the police blotter information defined by § 1-215 (b) (1) subject to complete disclosure under §§ 1-215 (a) and 1-210 (a), along with one item described in § 1-215 (b) (2), as designated by the law enforcement agency, the content of which may be circumscribed in accordance with § 1-210 (b) (3).[19] Accordingly, pursuant to § 1-2z, we turn to extratextual sources, including the legislative history, to determine the legislature's intention in enacting and amending § 1-215.

## C

### Extratextual Sources

In the session following the publication of this court's decision in *Gifford*, the legislature enacted Public Act 94-246, which, inter alia, created the provisions of § 1-215 that are at issue in the present case.[20] The legislative history of Public Act 94-246 demonstrates that it is a product of compromise that is not, contrary to the arguments of the commission, a wholesale rejection of the statutory analysis in *Gifford*. The provisions of Public Act 94-246 relevant to the present case were originally introduced in the Senate as an amendment to House Bill No. 5789, 1994 Sess. (Senate Amendment A), on April 28, 1994.[21] A primary distinguishing feature of Senate Amendment A was that it required the police to disclose both the blotter information *and* "the arrest report, incident report or any similar report of the arrest of a person." Moreover, the Senate Amendment A did not offer the option of a news release or make clear that the choice of which document to disclose remained in the discretion of the law enforcement agency. See footnote 21 of this opinion. The legislative debate in the Senate about Senate Amendment A reflected a tension between its opponents, who endorsed the holding in *Gifford* as responsive to the investigative and public safety needs of law enforcement, exemplified by the remarks of Senator William DiBella;[22] see 37 S. Proc., Pt. 6, 1994 Sess., pp. 1961–69; and its supporters, including Senator George Jepsen, its sponsor, who viewed Senate Amendment A as an important weapon for protecting citizens from police abuses and restoring what had been a past practice of the free disclosure of arrest related information.[23] See id., pp. 1964–65. Ultimately, Senator DiBella's motion to reject Senate Amendment A failed twenty-two to eleven, with three Senators absent. See id., pp. 1983–84. The entire bill then passed the Senate unanimously as amended and moved to the House of Representatives. Id., p. 1986.

The response of the House of Representatives to the original draft of Senate Amendment A is particularly telling with respect to the interpretation of § 1-215 because the language at issue in this appeal comes from the significant alterations to Senate Amendment A necessary for the bill to pass that chamber. Significantly, in introducing Senate Amendment A in the House, Representative Ellen Scalettar described it as "virtually the same" as an earlier unsuccessful attempt in that chamber to amend § 1-215, except for the addition of a provision to § 1-210 (b) (3) exempting signed witness statements from disclosure. 37 H.R. Proc., Pt. 20, 1994 Sess., pp. 7372–73, 7381–83. In opposing the merits of Senate Amendment A, Representative Dale Radcliffe called it "a distinction without a difference" to earlier unsuccessful legislation, and characterized the existing statute, as interpreted by *Gifford*, as a

"floor" and "not a ceiling" stating that "[i]f the police department chooses to give information over and above that . . . which they are required to give, which is fairly extensive . . . they can. There is nothing prohibiting that."[24] Id., p. 7388. Representative Radcliffe further informed the House that Chief State's Attorney Jack Bailey was "extremely concerned" about Senate Amendment A, observing that its language "require[s] . . . release[s] of the arrest report *and* the incident report," which could endanger witnesses and informants, particularly given the time pressures faced by police officers completing such reports.[25] (Emphasis added.) Id., pp. 7388–92.

Representative Scalettar, joined by Representative William Wollenberg, informed the House, however, that Bailey and the state police had subsequently assented to Senate Amendment A subject to an additional amendment, which would add the term " 'news release' in the alternative," and provide an "option [to] the police [for] which document" to provide in response to requests. Id., pp. 7393–95. The House formally introduced such an amendment to House Bill No. 5789 (House Amendment B) later that same day,[26] which Representative Scalettar described as "chang[ing] the definition of record of arrest so that it now includes news releases in addition to the information that had been included before, and it makes explicit that the law enforcement agency can designate which of the reports it releases, and it may release any number of the reports, but at least one of them." 37 H.R. Proc., Pt. 21, 1994 Sess., p. 7546. She noted that the change was "intended to clarify the statute, and the requirement that *something more* than the minimal information be given"—namely, "*some narrative* . . . at the time of the arrest." (Emphasis added.) Id. Representative Wollenberg's comments on House Amendment B further indicate that the post-*Gifford* amendment of § 1-215 was a compromise measure, which addressed safety concerns at the expense of full disclosure by giving law enforcement agencies far greater discretion than Senate Amendment A had originally provided. See id., p. 7547 ("I don't expect the [Freedom of Information] award this year"). House Amendment B, ultimately enacted as Public Act 94-246, §§ 13, 14 and 15, then passed that chamber overwhelmingly. Id., p. 7548.

We conclude that the transcripts of the legislative debate surrounding passage of Public Act 94-246[27] do not support the commission's argument that the legislature added the reference to § 1-210 (b) (3) in order to eviscerate *Gifford* in its entirety or amended § 1-215 so that it would be interpreted consistently with the analysis of Justice Berdon's dissenting opinion in *Gifford*, namely, that § 1-215 is not the exclusive source of law enforcement agencies' disclosure obligations when a criminal prosecution is pending. See footnote 17 of this opinion. First, the legislature did not change

the specific language of § 1-215 (a) that underlies this particular point in *Gifford*, namely, its first sentence, " '[n]otwithstanding any provision of the general statutes to the contrary . . . .' " *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 655 n.15; Cf. *Chief of Police* v. *Freedom of Information Commission*, 252 Conn. 377, 393–96, 746 A.2d 1264 (2000) (noting that, post-*Gifford*, Public Act 94-246, § 15, changed word "affect" to "limit" in General Statutes § 1-213, with respect to act's effect on discovery, but concluding that change did not alter meaning of statute). Second, there is nothing in the legislative history that demonstrates any disagreement with the *Gifford* majority's conclusion that § 1-215 is the sole statutory provision governing the disclosure of arrest reports or police reports pursuant to the act while a criminal prosecution is pending. Rather, the legislative history, and especially the comments during the House proceedings, indicates only that the legislature determined that the 1993 revision of § 1-215, as explicated by *Gifford*, simply did not require the police to disclose a sufficient narrative of the details surrounding an arrest while a prosecution was pending. Finally, during the legislative debates, there was not one mention of Justice Berdon's dissenting opinion or, specifically, his alternate view of the structural relationship between §§ 1-210 and 1-215.

Moreover, the commission's construction of § 1-215 is belied by the addition, through House Amendment B of the statutory language that proved critical to the passage of § 13 of Public Act 94-246, namely, the provision which expressly permits law enforcement agencies to "designate" their disclosure option and, in particular, to craft a "news release" rather than supplying the original arrest or incident reports. Interpreting the act, as the commission urges, to require police disclosure of primary investigative documents, such as original arrest reports or photographs[28] during a pending prosecution—even if subject to exemptions under § 1-210 (b) (3)—would render superfluous the language contained in § 1-215 (b) (2) that gives law enforcement agencies discretion to meet their disclosure obligations under the act by providing secondary source material such as news releases. This, of course, would contravene the "cardinal" maxim that statutes shall not be construed to render any "sentence, clause, or phrase" superfluous or meaningless. (Internal quotation marks omitted.) *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008). Thus, we conclude that the legislative history of Public Act 94-246 demonstrates that the legislature's amendment to § 1-215 was a very limited response to *Gifford*. See, e.g., *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 200–201, 676 A.2d 831 (1996) ("[T]he legislature is presumed to be aware of the interpretation of a statute and . . . its subsequent nonaction may be understood as a validation of that interpretation. . . . This presumption is

strengthened when the legislature has affirmatively reenacted the statute after the interpretation in question." [Internal quotation marks omitted.]).

Consistent with the discretion afforded to law enforcement agencies by § 1-215 (b) (2), we further conclude that the legislative history supports the department's argument that the reference to § 1-210 (b) (3) in § 1-215 (a) was only intended to guide law enforcement agencies' compliance with § 1-215 (b) (2).[29] This limits, then, the commission's authority in this context to ensuring that police departments satisfy their obligations under § 1-215 (b) (1) to supply the police blotter information, and § 1-215 (b) (2) to provide some meaningful narrative about the arrest, thereby excepting pending prosecutions from the general disclosure obligation imposed by § 1-210 (a) of the act, as cabined by the law enforcement exemptions of § 1-210 (b) (3). To this end, the legislature's addition of the language in § 1-215 (a), providing that "disclosure of data or information other than that set forth" in § 1-215 (b) (1) "shall be subject to the provisions" of § 1-210 (b) (3), along with language stating that "[a]ny personal possessions or effects found on a person at the time of such person's arrest shall not be disclosed unless such possessions or effects are relevant to the crime for which such person was arrested," was meant only to guide law enforcement agencies in complying with the additional disclosure required by § 1-215 (b) (2).[30] Accordingly, guided by *Gifford*, we conclude that law enforcement agencies' disclosure obligations under the act during pending prosecutions remain exclusively governed by § 1-215.[31]

Insofar as there is no claim that the news release provided by the department did not contain a narrative sufficiently meaningful to satisfy its obligation under § 1-215,[32] we conclude that the Appellate Court properly determined that the commission incorrectly found that the department had violated the act in this case.

## II

### ADMINISTRATIVE DEFERENCE CLAIMS

The commission next claims that its construction of the act with respect to the relationship between §§ 1-210 (b) (3) and 1-215, is entitled to deference because it is reasonable and time-tested. The department contends in response that the commission's interpretation is not entitled to deference because the issue presented by this case is a first impression question of statutory construction, involving an unambiguous statute, which raises a pure question of law. The department also contends that any further expansion of the legislature's 1994 response to *Gifford* requires an additional legislative remedy, given this court's particular hesitation to overrule or modify decisions interpreting statutes. We agree with the department and, accordingly, conclude

that the commission's interpretation of the act in this case is not entitled to deference.

"[T]he traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . . Conversely, an agency's interpretation of a statute is accorded deference when the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable. . . . Deference is warranted in such circumstances because a time-tested interpretation, like judicial review, provides an opportunity for aggrieved parties to contest that interpretation. Moreover, in certain circumstances, the legislature's failure to make changes to a long-standing agency interpretation implies its acquiescence to the agency's construction of the statute. . . . For these reasons, this court long has adhered to the principle that when a governmental agency's time-tested interpretation [of a statute] is reasonable it should be accorded great weight by the courts." (Citations omitted; internal quotation marks omitted.) *Tuxis Ohr's Fuel, Inc.* v. *Administrator, Unemployment Compensation Act*, 309 Conn. 412, 422–23, 72 A.3d 13 (2013), quoting *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 163–64, 931 A.2d 890 (2007); see also *Dept. of Public Safety* v. *State Board of Labor Relations*, supra, 296 Conn. 600–601.

In determining whether an administrative agency's interpretation is reasonable, we conduct a searching inquiry of that construction, which is not limited to determining whether the statutory text is ambiguous for purposes of § 1-2z. See *Stec* v. *Raymark Industries, Inc.*, 299 Conn. 346, 360–71, 10 A.3d 1 (2010) (conducting extensive examination of plain language of workers' compensation appeals statute, General Statutes § 31-301 [a], its relationship to related statutes, legislative history, and public policy in concluding that compensation review board's interpretation of appeal period as jurisdictional "is both time-tested and reasonable and therefore entitled to deference"); *Dept. of Public Safety* v. *State Board of Labor Relations*, supra, 296 Conn. 599 ("We also must determine whether the [board's] interpretation is reasonable. . . . In so doing, we apply our established rules of statutory construction." [Internal quotation marks omitted.]). Put differently, the agency's construction does not, without more, operate to "break a tie" upon a determination that a statute is ambiguous for purposes of § 1-2z.

Assuming, without deciding, that the commission's construction of the relevant language of § 1-215 on six occasions in the nineteen years since the enactment of Public Act 94-246 is time-tested,[33] we conclude that that

interpretation is not reasonable in light of the ample extratextual evidence discussed previously in this opinion. Accordingly, we decline to defer to the commission's construction, which undercuts the legislature's intent to respond to *Gifford* by providing only for limited additional disclosure during a pending prosecution, in the form of a meaningful narrative, to be furnished at the law enforcement agency's discretion.

Finally, the commission and the amici suggest numerous salutary effects of requiring greater disclosure under the act by law enforcement agencies in the context of pending prosecutions, including preventing harassment and discrimination,[34] some of which were noted by Senator Jepsen in his remarks in support of the bill that was enacted as Public Act 94-246. See footnote 23 of this opinion. The commission also appears to suggest that the obligations imposed by § 1-215, namely, "bare police blotter information and a press release," apply only "at the time of the arrest. They are not required to disclose the entire incident report or arrest report, although they may elect to do so. Subsequently, all other requests for records are subject to the rather protective provisions of § 1-210 (b) (3)." This approach, which might well be reasonable and salutary as a policy matter, nevertheless is inconsistent with the existing statutory scheme under § 1-215, read in light of *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641, which exclusively governs, and does not set forth a specific time line for the disclosure of law enforcement records during pending prosecutions. Given the continuing vigorous legislative debate on open government matters both in 1994 and today, we deem balancing the various interests and articulating a coherent policy on this matter to be a uniquely legislative function. The General Assembly retains the prerogative to modify or clarify § 1-215 as it sees fit.[35]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] The legislature recodified the act in 1999, which led, inter alia, to the transfer of General Statutes § 1-19 to what is currently General Statutes § 1-210, of General Statutes § 1-19b to what is currently General Statutes § 1-213, and of General Statutes § 1-20b to what is currently General Statutes § 1-215. For the sake of clarity, we utilize the current section numbers in our analysis, making alterations in quoted material when necessary.

[2] General Statutes § 1-215 provides: "(a) Notwithstanding any provision of the general statutes to the contrary, and except as otherwise provided in this section, any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-212 and subsection (a) of section 1-210, except that disclosure of data or information other than that set forth in subdivision (1) of subsection (b) of this section shall be subject to the provisions of subdivision (3) of subsection (b) of section 1-210. Any personal possessions or effects found on a person at the time of such person's arrest shall not be disclosed unless such possessions or effects are relevant to the crime for which such person was arrested.

"(b) For the purposes of this section, 'record of the arrest' means (1) the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested, and (2) at least one of the following, designated by the law enforcement agency: The arrest

report, incident report, news release or other similar report of the arrest of a person."

[3] See footnote 20 of this opinion for the relevant text of Public Act 94-246.

[4] General Statutes (Supp. 2014) § 1-210 provides in relevant part: "(a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to (1) inspect such records promptly during regular office or business hours, (2) copy such records in accordance with subsection (g) of section 1-212, or (3) receive a copy of such records in accordance with section 1-212. . . .

"(b) Nothing in the Freedom of Information Act shall be construed to require disclosure of . . .

"(3) Records of law enforcement agencies not otherwise available to the public which records were compiled in connection with the detection or investigation of crime, if the disclosure of said records would not be in the public interest because it would result in the disclosure of (A) the identity of informants not otherwise known or the identity of witnesses not otherwise known whose safety would be endangered or who would be subject to threat or intimidation if their identity was made known, (B) the identity of minor witnesses, (C) signed statements of witnesses, (D) information to be used in a prospective law enforcement action if prejudicial to such action, (E) investigatory techniques not otherwise known to the general public, (F) arrest records of a juvenile, which shall also include any investigatory files, concerning the arrest of such juvenile, compiled for law enforcement purposes, (G) the name and address of the victim of a sexual assault under section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b or 53a-73a, or injury or risk of injury, or impairing of morals under section 53-21, or of an attempt thereof, or (H) uncorroborated allegations subject to destruction pursuant to section 1-216 . . . ."

Hereinafter, unless otherwise noted, all references to § 1-210 are to the version codified in the 2014 supplement to the General Statutes.

[5] We granted the commission's petition for certification limited to the following issue: "Did the Appellate Court properly determine that, during a pending prosecution . . . §§ 1-215 and 1-210 (b) (2) and (3) require only the disclosure of the police blotter information of § 1-215 (b) (1) and an additional piece of information contained in § 1-215 (b) (2), and that the news release disclosed by the department of public safety met the requirements of the statute?" *Commissioner of Public Safety* v. *Freedom of Information Commission*, 307 Conn. 918, 919, 54 A.3d 562 (2012).

[6] We note that the department's name has changed to the Department of Emergency Services and Public Protection. See Public Acts 2011, No. 11-51, § 38. For the sake of consistency and convenience, we, like the Appellate Court, refer to the department by its former name. See *Commissioner of Public Safety* v. *Freedom of Information Commission*, 137 Conn. App. 307, 308, 48 A.3d 694 (2012).

[7] The complainants are Michelle Tuccitto Sullo, a reporter for the New Haven Register, and the New Haven Register (complainants). "Although the [complainants] were defendants at trial, they have not appealed." *Commissioner of Public Safety* v. *Freedom of Information Commission*, 137 Conn. App. 307, 308 n.1, 48 A.3d 694 (2012).

[8] The amici curiae are several open government advocacy organizations and media groups. The advocacy organizations are the Connecticut Council on Freedom of Information, the Connecticut Foundation for Open Government, and the American Civil Liberties Union. The media amici are the Associated Press, Bristol Press, The Day of New London, Lakeville Journal, Manchester Journal-Inquirer, Meriden Record-Journal, The Middletown Press, New Britain Herald, New Haven Register, Norwich Bulletin, Norwalk Hour, Torrington Register-Citizen, Waterbury Republican-American, Radio Television Digital News Association, Connecticut Chapter of the Society of Professional Journalists, and the Connecticut Daily Newspaper Association.

[9] Consistent with its analysis of the relationship between *Gifford* and the current revision of § 1-215, the Appellate Court rejected the commission's argument that the trial court had improperly failed to "defer to its construction of §§ 1-215 and 1-210 (b) (3), and that therefore, the court failed to follow the applicable scope of judicial review in an administrative appeal." *Commissioner of Public Safety* v. *Freedom of Information Commission*, supra, 137 Conn. App. 323. The Appellate Court held that it was "still bound by several conclusions of law made by [this court] in its decision in *Gifford*," and therefore, "it is inconsequential to [its] analysis whether the commis-

sion's interpretation of the statute has been time tested." Id., 323–24.

[10] As a threshold jurisdictional matter, we agree with the trial court's conclusion that this case became moot when the department made all relevant information available to the complainants during the pendency of this administrative appeal in that court, following the conclusion of the underlying prosecution. See *Commissioner of Public Safety* v. *Freedom of Information Commission*, supra, 137 Conn. App. 310–11. We also agree with the trial court's conclusion that this case remains reviewable under the "capable of repetition, yet evading review" exception to the mootness doctrine because of the time sensitive nature of the matters at issue, as well as the fact that there are numerous other administrative appeals pending that raise the same significant question of statutory interpretation. See id., 311; see also, e.g., *Loisel* v. *Rowe*, 233 Conn. 370, 382, 660 A.2d 323 (1995) (stating elements of capable of repetition, yet evading review, exception).

[11] The commission argues that the Appellate Court's decision in effect "judicially repeals § 1-210 (b) (3) by denying it any effect during a pending prosecution. It deprives the public of the right to see any police records beyond the 'record of the arrest' and a press release during the pendency of the prosecution," and that the "mandate [of the act] is to disclose blotter information at the time of the arrest, and make all other arrest records withholdable under § 1-210 (b) (3), where the facts support that conclusion."

[12] The commission contends that, because the "power to arrest and prosecute is one of the greatest powers of the state; it does not seem unreasonable for the state to have to account to the public for the circumstances of those arrests during the period of time when public interest is the most elevated— when the person is in jail. Delaying accountability to the public until the conclusion of the prosecution is like a newspaper publishing a correction to a story months after the scandal has passed: the moment for true public accountability is gone." In criticizing the Appellate Court's interpretation of the act, the commission observes that the "public will know who was arrested for what and when, but it will never be able to look at any additional details, no matter how important or innocuous, unless the police choose to reveal them. The circumstances surrounding even the most significant crimes in our state, and the actions of our law enforcement agencies in response to such crimes, become, under the reasoning of the court below, entirely confidential at the option of the law enforcement agency, until the prosecution is concluded. The result is quite plain: the public has no right to know anything . . . ."

Similarly, the amici argue that the "public has a strong interest in ensuring that law enforcement officials conform their actions to the law. Effective civilian oversight of law enforcement requires the disclosure of more than basic police blotter information. For example, police blotters do not indicate the arrested individual's race, a piece of data that sheds light on law enforcement practices that disproportionately target minorities."

[13] The department also makes the related argument that the commission's suggested interpretation of the act is "illogical" because it improperly reads out of § 1-215 the statutory language giving law enforcement agencies the discretion to determine how to comply with the act beyond the release of the blotter information required by § 1-215 (b) (1).

[14] General Statutes (Rev. to 1993) § 1-20b, presently codified as § 1-215; see footnote 1 of this opinion; provides: "Notwithstanding any provision of the general statutes to the contrary, any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19. For the purposes of this section, 'record of the arrest' means the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested." See also *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 645 n.6.

[15] In framing the issue, the court cautioned that "the facts of this case limit our discussion of the commission's claim solely to the issue of whether arrest reports must be disclosed *during the pendency of the criminal prosecution*. The facts of this case do not raise, nor do we need to decide, whether a police report *of any kind* must be released before an arrest is made, or whether an arrest report must be released after the criminal case to which the report relates has been fully adjudicated." (Emphasis added.) *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 651.

[16] The court also concluded that its reading of the text of § 1-215 was "buttressed by reference to [its] legislative history . . . ." *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 659. It observed that

the statute was first enacted in 1983 "in response to a growing concern that certain police departments were refusing to disclose even the names of persons who had been arrested by officers of those departments. . . . Section [1-215], as enacted, implements this purpose because it obligates the disclosure of the name of any person who has been arrested." (Citation omitted.) Id., citing 26 H.R. Proc., Pt. 8, 1983 Sess., p. 2772, remarks of Representative Richard D. Tulisano. The court emphasized that the 1983 legislative debate "specifically addressed the issues and policy concerns related to the disclosure of arrest reports," in particular, the safety of witnesses, informants, and police officers, and "indicates that the legislature, although addressing the problem of so-called 'secret arrests,' intended to limit the extent to which police were obligated to disclose an arrest report." *Gifford* v. *Freedom of Information Commission*, supra, 659; see also id., 660, citing 26 H.R. Proc., supra, pp. 2772–73, remarks of Representative Francis X. O'Neill, Jr. Given the legislature's addition of an amendment to the bill that was the "functional equivalent" of limiting the disclosure obligation to police blotter information, the court viewed this legislative "history . . . as strong evidence that the legislature intended by the enactment of § [1-215] to ensure that certain minimal information regarding arrests be disclosed by the police, but, at the same time, to ensure that the disclosure requirement did not include the entire arrest report." *Gifford* v. *Freedom of Information Commission*, supra, 660–61; see also id., 661 n.17 (citing legislators' comments favoring, for clarity purposes, use of specific language over more general term "blotter entry").

[17] *Gifford* was a three to two decision. See *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 666. In his dissent, Justice Berdon, joined by Justice Katz, made arguments evocative of those of the commission in the present case, namely, that the majority "ignores a key piece of legislation," in particular, the law enforcement exemption from disclosure in § 1-210 (b) (3), in juxtaposition with the act's general disclosure obligation under § 1-210 (a). Id., 668–69. Justice Berdon concluded that, if § 1-215 "were controlling as to the limits of disclosure for incident reports, as the majority contends, the exclusions in § [1-210] (b) (3) would be rendered superfluous. When a statute is all-inclusive, as in the case of § [1-210] (a), and then provides specific exceptions, as in the case of § [1-210] (b), '[t]he careful delineation of the bounds of this exemption gives unusual force to the principle that the express mention in a statute of one exemption precludes reading others into it.' . . . Likewise, the specific delineation of certain exemptions means that the exemptions cannot be ignored." (Citations omitted.) Id., 669. Justice Berdon emphasized that "there is nothing in § [1-215] that *limits* disclosure to this [police blotter] information only, rather it sets a bare minimum of information that *must* be disclosed," and "[r]eading this body of law together, it is only logical to conclude from the plain language of the act that incident reports prepared and maintained by local police must be disclosed unless one or more of the exceptions set forth in § [1-210] (b) (3) have been met. Even if one or more of the exceptions are met, however, at the very least there must be disclosure of the 'record of arrest' (except for juvenile and erased records). As noted above, the record of the arrest includes 'the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested.' " (Emphasis in original.) Id., 669–70; see also id., 673–75 (*Berdon, J.*, dissenting) (discussing first amendment and public policy factors supporting greater disclosure of law enforcement activities). Thus, Justice Berdon ultimately concluded that the "plain language of the act requires public disclosure of an incident report prepared by the police at the time it is made unless the police can demonstrate the need for nondisclosure under § [1-210] (b). Anything less would run afoul of our state and federal constitutions." Id., 676.

[18] We note that *Gifford* stated, in dicta, that its conclusion was supported by the language of the statutory predecessor to General Statutes § 1-213, General Statutes (Rev. to 1993) § 1-19b (b). *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 662. That statute provided in relevant part: "Nothing in [the act] . . . shall be deemed in any manner to . . . *affect* the rights of litigants . . . under the laws of discovery of this state . . . ." (Emphasis added.) General Statutes (Rev. to 1993) § 1-19b (b). Specifically, in *Gifford* this court reasoned that, "[a]s a general matter, it is undisputed that, absent an open file policy maintained by a state's attorney, a criminal defendant does not have immediate access to an arrest report. Such a report ordinarily need not be disclosed by the state except to the extent ordered by the court pursuant to the rules of discovery. . . .

"Public access to arrest reports while the prosecution is pending would affect the rights of litigants under the laws of discovery because a defendant, as a member of the public, would have immediate access to documents otherwise unavailable under our discovery rules. On the other hand, the state's attorney's rights would be adversely affected, because the defendant would have immediate access to documents upon which the prosecutor relies to make strategic decisions regarding the prosecution and to decide whether to request further investigation by the police. Indeed, the commission itself has concluded that disclosure of arrest reports to criminal defendants while their prosecution is pending would conflict with the rules of discovery." (Citations omitted; footnotes omitted.) *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 662–65. The court determined that, in "essence, the commission's claim, and the argument of the dissent, would transform the commission, an executive agency, into the overseer of criminal discovery rules. In light of the clear expression of a contrary intent in § [1-215], we decline to read the act so as to require such an extraordinary result." Id., 665–66; but see id., 670 (*Berdon, J.*, dissenting) (criticizing majority's observations with respect to discovery as speculative because commission had "never made a finding that disclosure of the incident report would affect the rights of anyone in this case").

Several years later, this court expressly disavowed *Gifford*'s discovery dictum with respect to § 1-213. See *Chief of Police* v. *Freedom of Information Commission*, 252 Conn. 377, 392, 746 A.2d 1264 (2000) (describing dictum as "ill-advised"). Although the legislature subsequently changed the word "affect" to "limit"; see Public Act 94-246, § 15; this court held in *Chief of Police* v. *Freedom of Information Commission*, supra, 395–96, that this change did not alter the meaning of the statute. It nevertheless concluded, in contrast to the *Gifford* dictum, that "the provisions of the act do not affect or limit discovery rights, and discovery rights do not affect or limit the provisions of the act. The two operate separately and independently." Id., 396; see also id., 397–98 ("Although in many cases the two routes for disclosure might overlap, in some cases they might arrive at different destinations. The fact that a member of the public might also be an adversary of the agency, however, does not by itself strip him of his rights under the act. Moreover, there may also be instances in which a litigant would be able to secure documents through discovery that are exempt from disclosure under the act. The reason for that is, likewise, rooted in the fact that the act and discovery rules have different purposes and limits.").

[19] The reasonableness of both parties' textual arguments is bolstered by reference to the potentially conflicting public policies on which they are founded, namely, the commission's argument that § 1-215 promotes transparency in government and the department's position that it is a limited disclosure mechanism intended to protect the integrity of pending criminal prosecutions.

[20] Although the bulk of Public Act 94-246 consists of provisions establishing a DNA data bank and the registration of sexual offenders, it also contains three sections that amended certain provisions of the act. See Public Act 94-246, §§ 13 through 15. We set forth the text of these three sections in turn. We note that, within these quotations, additions are represented by capital letters and deletions are represented by brackets.

Section 13 of Public Act 94-246 repealed General Statutes (Rev. to 1993) § 1-20b and substituted the following language in lieu thereof:

"(*a*) Notwithstanding any provision of the general statutes to the contrary, any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19, EXCEPT THAT DISCLOSURE OF DATA OR INFORMATION OTHER THAN THAT SET FORTH IN SUBDIVISION (1) OF SUBSECTION (b) OF THIS SECTION SHALL BE SUBJECT TO THE PROVISIONS OF SUBDIVISION (3) OF SUBSECTION (b) OF SECTION 1-19, AS AMENDED BY SECTION 14 OF THIS ACT.

"(*b*) For the purposes of this section, 'record of the arrest' means (*1*) the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested, and (2) AT LEAST ONE OF THE FOLLOWING, DESIGNATED BY THE LAW ENFORCEMENT AGENCY: THE ARREST REPORT, INCIDENT REPORT, NEWS RELEASE OR OTHER SIMILAR REPORT OF THE ARREST OF A PERSON."

The legislature subsequently transferred this language to § 1-215. See footnote 1 of this opinion.

Section 14 of Public Act 94-246 repealed General Statutes (Rev. to 1993) § 1-19 and substituted the following language in lieu thereof: "(b) Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive,

shall be construed to require disclosure of . . . (3) records of law enforcement agencies not otherwise available to the public which records were compiled in connection with the detection or investigation of crime, if the disclosure of said records would not be in the public interest because it would result in the disclosure of (A) the identity of informants not otherwise known OR THE IDENTITY OF WITNESSES NOT OTHERWISE KNOWN WHOSE SAFETY WOULD BE ENDANGERED OR WHO WOULD BE SUBJECT TO THREAT OR INTIMIDATION IF THEIR IDENTITY WAS MADE KNOWN, (B) SIGNED STATEMENTS OF WITNESSES, (*C*) information to be used in a prospective law enforcement action if prejudicial to such action . . . (*D*) investigatory techniques not otherwise known to the general public . . . (*E*) arrest records of a juvenile, which shall also include any investigatory files, concerning the arrest of such juvenile, compiled for law enforcement purposes . . . (*F*) the name and address of the victim of a sexual assault under section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b or 53a-73a, or injury or risk of injury, or impairing of morals under section 53-21, or of an attempt thereof or . . . (*G*) uncorroborated allegations subject to destruction pursuant to section 1-20c . . . .”

The legislature subsequently transferred this language to § 1-210. See footnote 1 of this opinion.

Section 15 of Public Act 94-246 repealed General Statutes (Rev. to 1993) § 1-19b and substituted the following language in lieu thereof: “(b) Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be deemed in any manner to (1) affect the status of judicial records as they existed prior to October 1, 1975, nor to [affect] LIMIT the rights of litigants, including parties to administrative proceedings, under the laws of discovery of this state . . . .”

The legislature subsequently transferred this language to General Statutes § 1-213. See footnote 1 of this opinion.

[21] In contrast to the legislation ultimately enacted as Public Act 94-246, §§ 13 through 15; see footnote 20 of this opinion; the initial draft of the Senate Amendment A provided in relevant part: “Sec. 13. Section 1-20b of the general statutes is repealed and the following is substituted in lieu thereof:

“(a) Notwithstanding any provision of the general statutes to the contrary, any record of the arrest of any person, other than a juvenile, except a record erased pursuant to chapter 961a, shall be a public record from the time of such arrest and shall be disclosed in accordance with the provisions of section 1-15 and subsection (a) of section 1-19, EXCEPT THAT DISCLOSURE OF DATA OR INFORMATION OTHER THAN THAT SET FORTH IN SUBDIVISION (2) OF SUBSECTION (b) OF THIS SECTION SHALL BE SUBJECT TO THE PROVISIONS OF SUBDIVISION (3) OF SUBSECTION (b) OF SECTION 1-19, AS AMENDED BY SECTION 14 OF THIS ACT.

“(b) For the purposes of this section, ‘record of the arrest’ means (1) THE ARREST REPORT, INCIDENT REPORT OR ANY SIMILAR REPORT OF THE ARREST OF A PERSON, AND (2) the name and address of the person arrested, the date, time and place of the arrest and the offense for which the person was arrested. . . .”

[22] Senator DiBella criticized Senate Amendment A as “allow[ing] police reports to be disseminated freely to the press” pursuant to the act. 37 S. Proc., Pt. 6, 1994 Sess., p. 1961. He informed the Senate that, “under . . . [*Gifford*] the Supreme Court ruled that the police department could make a decision as to release of information and the information would be restricted to name, date, time, and address and nature of the crime or the crime that was committed.” Id., p. 1961. Senator DiBella lauded *Gifford* as “giv[ing] the police department control over the process of information . . . to ensure that the investigation goes forward without creating a problem for the department itself in the course of an investigation of a crime.” Id., p. 1962. He criticized Senate Amendment A as creating “a major problem for our police departments” given that witness intimidation by gangs had posed a major problem in Hartford. Id., pp. 1961–63. Senator DiBella stated that, in contrast to Senate Amendment A, *Gifford* was “on the money” insofar as it gave the police “the discretion of releasing critical information” without jeopardizing investigations or the safety of people involved, and argued that removing this discretion “would hinder the criminal justice system . . . at a time when that criminal justice system is under tremendous pressure by virtue of what’s happening in our urban areas . . . .” Id., pp. 1962–63; see also id., pp. 1968–69, remarks of Senator DiBella (reiterating that *Gifford* was “clarification” of “existing practice” that “balanced” public’s right to know “against the rights of those people that would be protected in the course of an investigation”).

Responding to Senator George Jepsen’s reliance on exemptions under § 1-210 (b) (3) for the protection of witnesses and investigations; see footnote 23 of this opinion; Senator DiBella argued that the primary practical flaw

of Senate Amendment A was that it required "an immediate decision when . . . the report was being drawn up," and did not give the police "the ability to evaluate extensively the effects and ramifications of releasing such information in the course of that case." Id., p. 1968. Answering a question from Senator Robert Genuario, Senator DiBella then stated that Senate Amendment A did not adequately protect witnesses, despite the fact that it gave the police the option not to disclose the identities of witnesses at risk, or their signed statements, because he had learned from the Hartford police chief that, early in investigations, police departments often lacked the knowledge about the significance of various witnesses necessary to make an informed decision as to disclosure. See id., pp. 1976–78; see also id., pp. 1977–78, remarks of Senator DiBella (describing police departments' "limited ability . . . to react" and "protect the integrity of the case as well as the integrity of the players within . . . from public consumption"). Replying to this point, Senator Jepsen stated that these concerns were present in "only a small percentage of the crimes that are committed," out of the "thousands of arrests that occur in a year," and that his experience from Stamford was that local police have the knowledge needed to "make these kinds of judgments" quickly. Id., pp. 1979–80.

[23] Speaking in support of Senate Amendment A, Senator Jepsen stated that, "[b]y closing off arrest records, we open up arrest itself as an avenue for abuse of civil rights because it will no longer be necessary for the police to defend an arrest on the basis of information that would be immediately available to public scrutiny." 37 S. Proc., supra, p. 1965; see also id., remarks of Senator Jepsen ("the cornerstone of democracy lies in the free dissemination of information"). He described Senate Amendment A as providing the media with primary source material likely to increase the accuracy of reporting, and stated that the "only legitimate point that I have heard is the issue of protecting witnesses," although his view was that the "draft adequately protect[s] witnesses . . . if that isn't sufficient, that is where the direction of opponents' efforts ought to be directed, to clarifying how to protect witnesses who deserve protection, not to totally throwing out a fundament[al] tenet of [the] democratic institution." Id., pp. 1974–75; see also id., p. 1967, remarks of Senator Jepsen (arguing that Senate Amendment A, as drafted, addressed importance of witness safety because, under § 1-210 [b] [3], "the police have the discretion to withhold the identity of potential witnesses who could be placed at jeopardy").

Addressing *Gifford*, Senator Jepsen described it as a departure from "years" of practice with respect to "the free disclosure of such information." Id., p. 1966. Although Senator Jepsen stated that Senate Amendment A would "overturn" the holding of *Gifford* with respect to law enforcement agencies' disclosure obligations, he also argued that this court had not "offer[ed] [an] opinion about restricting information," but "merely said under current law it is not required that it be disclosed." Id., pp. 1966–67.

The remarks of other Senators supporting Senate Amendment A are consistent with those of Senator Jepsen. See id., pp. 1969–70, remarks of Senator John Kissel (opining that disclosure was "taken for granted" prior to *Gifford*, and that police departments would likely "take great pain, even at the outset, to protect the identity of any witnesses or potential witnesses," thus allowing legislature to "[err] on the side of full disclosure"); id., pp. 1970–71, remarks of Senator William Aniskovich (supporting Senate Amendment A as allowing for "open and fair analysis of issues" rather than fostering "system into which abuse of power will be more likely").

[24] Representative Radcliffe also attempted to thwart passage of Senate Amendment A on procedural grounds, contending, as a point of order, that it was not sufficiently "germane to the underlying file . . . dealing with a DNA bank and registration of sex offenders." 37 H.R. Proc., supra, p. 7373. The House voted, however, to uphold the decision of the chair, Deputy Speaker David Pudlin, finding that Senate Amendment A was sufficiently related to the underlying subject matter of House Bill No. 5789. Id., pp. 7374–79.

[25] In particular, Representative Radcliffe stated that the reports required by Senate Amendment A "could contain information as to individuals providing information. The arrest report and the incident report could contain information which the officer indicates that the time that the report is filed at the end of the shift, but on reflection might be information that they would not wish to be disseminated publicly and this is not a decision when making out an arrest report that an officer should make at the close of a tour of duty. That information remains unchanged." 37 H.R. Proc., supra, p. 7389. Representative Radcliffe opined that "the public's right to know is protected"

by the information required under the current statute as interpreted by *Gifford*, emphasizing that "[t]here is no constitutional right that requires a police captain to give a full report and a full narrative to members of the [F]ourth [E]state." Id., p. 7391. Ultimately, Representative Radcliffe stated that this court's decision in *Gifford* "strikes the appropriate balance," and criticized Senate Amendment A as "tip[ping] the scale too far in favor of disclosure of information that . . . could affect police investigations and compromise our local and state police departments." Id., pp. 7391–92.

[26] Representative Wollenberg then emphasized that his personal support for the legislation was conditioned on the inclusion of that term; see 37 H.R. Proc., supra, pp. 7396–97; which Representative Scalettar clarified as providing the police with "an option . . . [to] give an arrest report, an incident report, a news release or other similar report of the arrest of the person." Id., pp. 7398–99; see also id., pp. 7399–7400, remarks of Representative Wollenberg (observing that retention of existing language in Senate Amendment A would lead to "hours" of debate). The House then voted to adopt Senate Amendment A, and put the matter over temporarily to allow for the promulgation of House Amendment B. Id., pp. 7400–7402.

[27] We note that there is no joint standing committee testimony with respect to this aspect of Public Act 94-246.

[28] The commission posits specifically that "law enforcement records— with the exception of the blotter or 'record of the arrest' disclosed at the time of the arrest—such as the incident or arrest report (if not voluntarily provided in addition to basic police blotter information), supplemental incident reports, witness statements, chain of custody records, identification records, mug shots, documentary evidence, investigatory records, lab reports, and so forth are all governed by . . . § 1-210 (b) (3), which allows law enforcement agencies to withhold these records if, e.g., the prosecution would be prejudiced or if protected individual's identities would be disclosed."

[29] We note that the bill analysis from the Office of Legislative Research considering the cumulative effect of Senate Amendment A and House Amendment B on House Bill No. 5789, also indicates that the legislature did not envision that its amendment of § 1-215 by adding a reference to § 1-210 (b) (3) would alter the holding in *Gifford* that § 1-215 is the sole statutory provision governing the disclosure of arrest reports or police reports pursuant to the act while a criminal prosecution is pending. See Office of Legislative Research, Bill Analysis, Substitute House Bill 5789, "An Act concerning a DNA Data Bank and the Registration of Sexual Offenders," (1994) (report). Although "the comments of the [O]ffice of [L]egislative [R]esearch are not, in and of themselves, evidence of legislative intent, they properly may bear on the legislature's knowledge of interpretive problems that could arise from a bill." (Internal quotation marks omitted.) *Butts* v. *Bysiewicz*, 298 Conn. 665, 688 n.22, 5 A.3d 932 (2010); see also, e.g., *State* v. *George J.*, 280 Conn. 551, 575, 910 A.2d 931 (2006) (relying on statement in report by Office of Legislative Research to conclude that legislature had knowledge that extended statute of limitations would apply to offense of risk of injury to child, and would have enacted clarifying measures if it had intended otherwise), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). In this case, the report refers specifically to § 1-210 (b) (3), noting only that the "bill makes the statutory list of reasons not to disclose information apply to arrest records, and it expands that list so as to allow the police to refuse to disclose the identity of witnesses whose safety would be endangered or who would be subject to threat or intimidation if their identity was made known. It also allows refusal to disclose the signed statements of witnesses." Office of Legislative Research, supra. The report does not, however, cite Justice Berdon's dissenting opinion in *Gifford*, or otherwise indicate that the legislature's response to *Gifford* gave § 1-210 (b) (3) any greater independent significance with respect to increasing law enforcement agencies' disclosure obligations during pending prosecutions.

[30] Consistent with our ambiguity determination under § 1-2z, we acknowledge the commission's point that the statutory language at issue is "roundabout," and that the legislature could have achieved this result more clearly by providing instead in § 1-215 (a) that "disclosure of data or information set forth in subdivision (2) of subsection (b) of this section shall be subject to the provisions of subdivision (3) of subsection (b) of section 1-210." Nevertheless, our construction of the ambiguous text of § 1-215 is supported by the legislative history that strongly suggests that the legislature embraced only a limited response to *Gifford*, and did not disagree with that decision's overall analysis of the structure of the act.

[31] We disagree with the commission's argument that our interpretation is

inconsistent with the evidentiary framework established by the Appellate Court's decision in *Dept. of Public Safety* v. *Freedom of Information Commission*, 51 Conn. App. 100, 720 A.2d 268 (1998). In that case, the Appellate Court concluded that the invocation of § 1-210 (b) (3) (C) "requires an evidentiary showing (1) that the records are to be used in a prospective law enforcement action and (2) that the disclosure of the records would be prejudicial to such action." Id., 105. In holding that the trial court had improperly sustained an administrative appeal from a commission decision requiring the state police to provide access to reports, witness statements, and other records pertaining to their investigation of a drowning death, the Appellate Court determined that it did not matter that the requested records had not yet been reviewed by prosecutors, because the act "does not require that an investigation be closed before disclosure is required. Additionally, the statute is not satisfied and, consequently, information is not exempted from disclosure by the mere good faith assertion that the matter to which the information pertains is potentially criminal. As we have stated, there must be an evidentiary showing that the actual information sought is going to be used in a law enforcement action and that the disclosure of that information would be prejudicial to that action." Id., 105. Our interpretation of § 1-215 is consistent with the evidentiary framework established in *Dept. of Public Safety* v. *Freedom of Information Commission*, supra, 100, because that case did not concern a request for disclosures during a pending prosecution, or even cite § 1-215 or its predecessor. Rather, it concerned the preprosecution and postinvestigation disclosure circumstances distinguished in *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 654 n.14, which are governed by the act generally under § 1-210 (a), subject to exemptions under § 1-210 (b) (3).

Acknowledging this distinction, we note in particular our disagreement with the amici's argument that this construction of § 1-215 creates "an odd loophole which allows for the perpetual nondisclosure of information in 'cold cases,' " which remain pending without an arrest being made. Section 1-215 simply would not apply in a situation, like the cold case envisioned by the amici, wherein there has not been an arrest resulting in a pending prosecution.

[32] The department's press release provided: " 'The accused was traveling with the victim northbound on Rt. 8 in the area of exit 17 in the town of Derby when he began to assault him with a metal object. The accused expressed his desire and intention of killing the victim and subsequently caused a serious, life-threatening injury to him. The victim was transported to an area hospital where he was treated for these injuries.

" 'The accused was taken into custody at the scene and transported to Troop I in Bethany for processing. He is being charged with [assault in the first degree of an elderly person, attempt to commit murder, and failure to respond/plea]. He was held on a $100,000 bond relating to the assault incident and a court set $103 bond relating to the active warrant on file through the Shelton [P]olice [D]epartment.' " *Commissioner of Public Safety* v. *Freedom of Information Commission*, supra, 137 Conn. App. 322 n.12.

[33] "A consideration of whether an interpretation is time-tested takes into account both the length of time since it first was articulated and the number of formal decisions applying that interpretation." *Sarrazin* v. *Coastal, Inc.*, 311 Conn. 581, 611 n.20, 89 A.3d 841 (2014); see also *Tuxis Ohr's Fuel, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 309 Conn. 446 n.10 (*Norcott, J.*, dissenting) (comparing cases and questioning whether "three board decisions over a period of fourteen years since the 1995 enactment of the statute constitute a 'time-tested interpretation' . . . subject to any deference from this court").

The commission and the amici accurately cite the following commission decisions as standing for the proposition that, on six occasions in the nineteen years since the enactment of Public Act 94-246, the commission has interpreted the act as requiring, during pending criminal proceedings, disclosures of police reports and other documents, such as photographs, subject to the exemptions in § 1-210 (b) (3), despite law enforcement agencies' previous disclosure of information that satisfies § 1-215. See *Levine* v. *Norwich Police Dept.*, Freedom of Information Commission, Docket No. FIC 1999-008 (July 28, 1999); *Catucci* v. *Thomaston Police Dept.*, Freedom of Information Commission, Docket No. FIC 1998-136 (October 28, 1998); *Book* v. *Fairfield Police Dept.*, Freedom of Information Commission, Docket No. FIC 1997-206 (February 18, 1998); *Field* v. *Major Crime Squad*, Freedom of Information Commission, Docket No. FIC 1997-248 (February 11, 1998); *Smykla* v. *Plainville Police Dept.*, Freedom of Information Commission, Docket No. FIC 1995-414 (July 24, 1996); *Journal Inquirer* v. *Coventry Police Dept.*, Freedom of Information Commission, Docket No. FIC 1993-237 (January 26, 1994); see also *Journal Inquirer* v. *Coventry Police Dept.*,

supra, Docket No. FIC 1993-237 (concluding, prior to amendment of § 1-215, that arrest warrant affidavit was subject to disclosure because *Gifford* applies only to arrest reports, and "does not decide what other law enforcement records or reports besides arrest reports may or may not be within the provisions of [§ 1-215]" [footnote omitted]); but see *Green* v. *Hartford Police Dept.*, supra, Docket No. FIC 1998-029 (police satisfied act, despite failing to disclose incident report during pending prosecution, when information that they did supply complied with § 1-215 because it was "functionally equivalent to a 'news release or other similar report of the arrest' ").

[34] The commission, supported by the amici, emphasizes that "the public has a legitimate interest in knowing whether minorities are disproportionately arrested; and that race is not required to be disclosed under § 1-215. The same interest might extend to information showing that an arrestee is an undocumented alien, or that individuals were exercising rights of free speech or assembly when arrested, or that an arrestee had an extensive criminal history, or that an arrestee is in a position of public trust, or whether an individual who commits a crime had been previously and repeatedly reported to but ignored by the police, or how a killer acquired weapons. Indeed, information of this kind *is* at least sometimes provided by the police. The question is not whether it should be disclosed, but whether the decision about disclosure should be vested in the police, or in an impartial administrative agency." (Emphasis in original.) See also footnote 12 of this opinion.

[35] We note that the amici ask us to overrule those portions of *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 641, left intact by Public Act 94-246, which hold that § 1-215 provides law enforcement agencies' exclusive disclosure obligation under the act during a pending prosecution. The amici argue, inter alia, that the "facts of *Gifford* enabled this court to quietly introduce the limiting principle" of pending prosecutions "without needing to justify its basis in the relevant statutory text," and that the "pending prosecution" qualifier is "alien to the plain language" of the statute. We decline to disturb *Gifford* because (1) its continued vitality is not properly before us in this appeal, and (2) even if it were, our well established approach to stare decisis with respect to decisions engaging in statutory construction counsels caution doing so in this context.

First, the commission does not expressly ask us to overrule *Gifford*, and the amici raise this issue for the first time in these proceedings. "Although an amicus brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues into an appeal, at least in cases where the parties are competently represented by counsel." *Universal City Studios, Inc.* v. *Corley*, 273 F.3d 429, 445 (2d Cir. 2001); see also, e.g., *Bell* v. *Wolfish*, 441 U.S. 520, 531 n.13, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (declining to reach amicus' argument that "federal courts have inherent authority to correct conditions of pretrial confinement and that the practices at issue in this case violate the Attorney General's alleged [statutory] duty to provide inmates with 'suitable quarters' " because "[n]either argument was presented to or passed on by the lower courts; nor have they been urged by either party in this [c]ourt"); *New Jersey Retail Merchants Assn.* v. *Sidamon-Eristoff*, 669 F.3d 374, 382 n.2 (3d Cir.) (declining to reach issue decided by trial court, but not raised by party and only in amicus brief), cert. denied,    U.S.   , 133 S. Ct. 528, 184 L. Ed. 2d 339 (2012).

Second, the doctrine of legislative acquiescence leaves us generally reluctant to disturb decisions interpreting statutes. See, e.g., *Brown & Brown, Inc.* v. *Blumenthal*, 297 Conn. 710, 731, 1 A.3d 21 (2010); *State* v. *Fernando A.*, 294 Conn. 1, 19, 981 A.2d 427 (2009). We are, however, more likely to reexamine a case interpreting a statute if (1) "the rule to be discarded may not be reasonably supposed to have determined the conduct of the litigants," such as a criminal law or tort principle; (2) the "issue presented . . . is not one that is likely to have reached the top of the legislative agenda" or attract legislative sponsorship; (3) the issue is not one previously subject to "extensive analysis" by this court; (4) the prior interpretation has arguably led to "unconscionable, anomalous or bizarre results"; and (5) the legislature has been silent on the matter, as compared to cases wherein we have "employed the [legislative acquiescence] doctrine not simply because of legislative inaction, but because the legislature affirmatively amended the statute subsequent to a judicial or administrative interpretation, but chose not to amend the specific provision of the statute at issue." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 523–25, 949 A.2d 1092 (2008).

Having considered these factors, none leaves us inclined to accept the

invitation of the amici to overrule what remains of *Gifford* after the enactment of Public Act 94-246. The circumstances of the enactment of Public Act 94-246, and the controversy that continues to this day about the relationship between criminal investigations and the public's right to know under the act, demonstrates that this is the kind of issue that is squarely on the radar of the legislature and the various interested entities. Indeed, that the legislature reacted quickly after the publication of *Gifford*, and that the decision was a prominent topic during legislative debates, indicates that the legislature's failure to disturb much of that decision's analysis was intentional, especially given Justice Berdon's vigorous dissenting opinion that highlighted multiple perceived flaws in the broader analysis in the majority's opinion. Accordingly, we leave the commission and the amici to pursue appropriate legislative remedies.